2001 OK CR 19

**Jackie Leland WRIGHT, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–98–1385.

Court of Criminal Appeals of Oklahoma.

June 28, 2001.

Rehearing Denied Sept. 11, 2001.

**1149**

Ronald R. Wallace, Brian Aspan, Assistant Public Defenders, Tulsa, OK, Counsel for Appellant, at trial.

Mark Collier, John Heil, Assistant District Attorneys, Tulsa County Courthouse, Tulsa, OK, Counsel for the State, at trial.

Gretchen Garner, Assistant Public Defender, Tulsa, OK, Counsel for Appellant, on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Patrick T. Crawley, Assistant Attorney General, Oklahoma City, OK, Counsel for the State, on appeal.

*OPINION*

LUMPKIN, Presiding Judge:

¶ 1 Appellant, Jackie Leland Wright, was tried by jury in the District Court of Tulsa County, Case No. CF–97–4687, and convicted of two counts of First Degree Murder (malice or, alternatively, felony murder), in violation of 21 O.S.1991, § 701.7. The jury recommended a sentence of life imprisonment without the possibility of parole on both counts. The trial judge sentenced Appellant in accordance with this verdict and ordered the sentences to run consecutively. Appellant now appeals his convictions and sentences.

¶ 2 On the morning of May 8, 1991, Tulsa firefighters received a report of a residential house fire. They converged on the scene and found a smoldering fire and two dead bodies. The victims, Coy and Tonya Wilkerson, had both been shot in the head.

¶ 3 Investigators discovered phone lines at the back of the house had been cut and evidence of a robbery inside the home. The perpetrators had used an accelerant in an attempt to burn down the house and destroy incriminating evidence. The fire never caught fully due to the damp weather.

¶ 4 Later that same evening, Vickie Holt saw two young men, later identified as Mahlon Bastion and Appellant, attempting to burn some documents by a rural road near her house. She had a short confrontation with the young men regarding the dangers of lighting fires. The young men left, but Ms. Holt took down the tag number of their two door sedan. She gathered the charred items the young men had been burning and placed them in a shoe box. The charred items included a checkbook belonging to Coy and Tonya Wilkerson.

¶ 5 That same evening, Wagoner County Deputy Sheriff Douglas London pulled over two young men in a Monte Carlo for speeding. The driver was Mahlon Bastion, and the passenger was Appellant. Deputy London issued a warning and allowed the young men to go.

¶ 6 On the day after the crime, Ms. Holt saw a television report about the murders and recognized the Wilkersons' names from the charred checkbook. She called the police. Detective Heim ran the tag number Ms. Holt gave to him and found a car registered to Mahlon Bastion that was only one number off.

¶ 7 Bastion was a former employee of Tulsa Expediting, Inc., where both Coy and Tonya Wilkerson worked. Tulsa Expediting, Inc. is owned by Tonya Wilkerson's father, Jim Phillips, and Bastion had been fired by Phillips in January of 1990. Bastion filed for unemployment, and the company opposed his claim. Bastion later told his wife he intended to get even with the Wilkersons by breaking into their building and then burning the evidence.

¶ 8 The Tulsa police proceeded to Bastion's apartment, but Bastion refused to come outside. He began firing shots at the police. Bastion ultimately committed suicide with his 9 mm handgun.

¶ 9 Police then obtained a warrant for Appellant's arrest. When the police confronted him, Appellant spoke to them briefly and then fled. After a brief chase, he was tackled to the ground and placed in custody.

¶ 10 When questioned by police, Appellant, then 16, admitted he had been with Bastion on the night of the murders. He claimed he left Bastion at about eleven to twelve o'clock and rode around on his bike until 6 a.m. the following morning. He also admitted going for a ride with Bastion the next night and observing Bastion pull over to set some items on fire. Appellant thought this was "weird."

¶ 11 The physical evidence collected at the scene did not link Appellant to the crime. However, Pauline Neal testified that Appellant had admitted killing Tonya Wilkerson by putting a pillow over her face and shooting her.[1] Appellant also told Neal he had taken a necklace off Tonya Wilkerson's neck and a ring from her finger. Charlene White testified that she heard Appellant speaking about the incident and say, "We went to rob a house but I didn't know anybody was going to get killed."[2]

¶ 12 Perhaps the most damaging evidence came from Jason Poorboy, who was Appellant's close friend and also a friend and next-door neighbor of Bastion. Poorboy testified that Appellant and Bastion had asked him to rob an undisclosed residence in the days prior to the murder and that "if people were there, we'd have to kill them."[3] Poorboy declined.[4] Poorboy also testified that Appellant confessed to being the shooter in both murders.[5] According to Poorboy, Appellant told him that Bastion's gun had jammed and so Appellant shot both victims. Poorboy claimed Appellant also said he shot the Wilkersons just to see what it felt like.[6]

¶ 13 In his first proposition of error, Appellant claims the State's delay in filing first degree murder charges against him until he was twenty three years old[7] denied him his rights to be certified as a child under Oklahoma's reverse certification statute, 10 O.S.1991, § 1104.2.[8] Appellant claims this delay amounted to a violation of the fourteenth amendment's due process clause because it was an "arbitrary deprivation" of a reverse certification hearing. Underlying this proposition is an allegation, implied or otherwise, of a deliberate delay by the State in order to prejudice Appellant's rights. In other words, the State allegedly waited six and a half years to file this case for the sole purpose of avoiding the statutory protections afforded to juveniles. At one point Appellant also argues, without supporting authority, that a "presumption of prejudice should arise" when such a lengthy delay occurs.

---

1. Tr. IV at 10–12.

2. Tr. IV at 97–98, 105.

3. Tr. III at 86, 103–05.

4. Poorboy's possible participation in the crime was an important issue in the trial. He admitted to burglarizing Tulsa Expediting, Inc. with Bastion and Appellant only two weeks before the murders. During this robbery, Poorboy stole a gun, which, according to Poorboy, Appellant used to kill the Wilkersons. Additionally, Poorboy had pending, but unrelated, charges against him at the time he told his story. Issues relating to his "deal" or lack of a deal with prosecutors will be addressed in our resolution of proposition two.

5. Tr. III at 108–114.

6. Tr. III at 124.

7. The murder occurred on May 8, 1991. Charges were filed against Appellant in October of 1997, i.e. six years and five months after the murder occurred.

8. Section 1104.2 of Title 10 has since been renumbered as 10 O.S.Supp.1997, § 7306–1.1. For purposes of the issues raised in this appeal, both sections are virtually identical.

¶ 14 We find no support in the record of any sort of deliberate, prejudicially-motivated delay by the State in waiting to file charges against Appellant until October of 1997. The record clearly reflects the delay was based upon a lack of evidence and that murder charges were promptly filed when incriminating evidence was obtained.[9] We do not find any legal support for Appellant's requested "presumption of prejudice" by mere delay in filing alone, and Appellant has not cited relevant authority to support such a presumption.[10]

¶ 15 Furthermore, this alleged deprivation was never raised at trial or in a pre-trial motion. There is no indication in the record that Appellant ever sought a reverse certification hearing until the instant appeal was filed. Our statutes place the burden to initiate reverse certification proceedings on the juvenile. *Gilley v. State*, 1992 OK CR 37, ¶ 5, 848 P.2d 578, 580.[11] Had Appellant desired to preserve any possible error for appellate review, he should have filed a pre-trial motion to be transferred to the juvenile system prior to his preliminary hearing, pursuant to 10 O.S.1991, § 1104.2(C).[12] However, no such request was ever made by Appellant or his counsel.

¶ 16 This proposition is essentially based upon conjecture and speculation of what might have happened if the State had immediately filed murder charges, if Appellant had requested reverse certification, and if a reverse certification hearing had been held. Failure to object with specificity to errors alleged to have occurred at trial, thus giving the trial court an opportunity to cure the error, waives that error for appellate review unless the error constitutes plain error. *Simpson v. State*, 1994 OK CR 40, ¶ 2, 876 P.2d 690, 693. Moreover, no judgment shall be set aside or new trial granted by this Court for error in a matter of procedure unless it is our opinion that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial

violation of a constitutional or statutory right. 20 O.S.1991, § 3001.1. Based upon the record and allegations before us, we cannot say plain error occurred or that Appellant was the recipient of a substantial violation of a constitutional or statutory right. This proposition is denied.

¶ 17 In his second proposition of error, Appellant alleges the prosecutors failed to disclose a plea agreement the State made with Jason Poorboy *before* he testified against Appellant. Appellant claims the State entered into a plea agreement that was contingent on Poorboy's "helpfulness," but never disclosed this agreement or its full nature to the defense. Appellant claims this practice violated discovery and due process, deprived Appellant of his right to confront Poorboy during cross-examination, and made Appellant's convictions inherently unreliable.

¶ 18 On November 24, 1998, Appellant filed a Motion for New Trial in which he asked the trial court to strike Poorboy's testimony in its entirety as violating his due process rights. The motion was premised upon the State's contacts with Jason Poorboy's attorney on the last day of discovery in the instant case and the dismissal of Poorboy's unrelated, pending felonies following Appellant's trial. Appellant's trial counsel did not cite any of the grounds listed in 22 O.S.1991, § 952 to support his motion. Presumably, the motion was based upon "newly discovered evidence, material to the defendant, and which he could not with reasonable diligence have discovered before the trial." *See* 22 O.S.1991, § 952(7).

¶ 19 The trial court did not hold an evidentiary hearing regarding this issue, as contemplated by the statute, but disposed of it summarily at Appellant's sentencing hearing, after brief oral argument by counsel. (It appears the trial court did not have a copy of the motion prior to the sentencing hearing, as the same had been filed just one day prior thereto.) Appellant's trial counsel did not

---

9. Tr. III at 71–72, 96, 128–29, 131–33, 145, 148, 132–34.

10. Rule 3.5(C)(6), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18 App. (1999) requires the presentation of relevant authority in support of arguments raised on appeal.

11. We note the absence of a claim that Appellant was not notified of a sixteen year old defendant's right to file an application for certification as a child.

12. See also 10 O.S.Supp.1997, § 7306–1.1(E).

specifically request an evidentiary hearing, however, but focused most of his attention on *United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998), *later overruled on rehearing en banc,* 165 F.3d 1297 (10th Cir.1999).

¶ 20 In a related matter, Appellant filed an Application to File Supplemental Brief in this Court, based upon our decision in *Dodd v. State,* 2000 OK CR 2, 993 P.2d 778. Therein, Appellant claims a supplemental brief is necessary because *Dodd* represents "new authority on issues previously raised" (proposition two of his appellate brief) and because *Dodd* decided an "issue of first impression" after the filing of Appellant's brief in chief. *See* Rule 3.4(F), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18 App. (2000). With respect to the "new authority on issues previously raised," Appellant points out that his appellate brief relied on the original *Dodd* opinion, *Dodd v. State,* 1999 OK CR 29, 9/4/99 O.B.J. Vol. 70, No. 31, 2382 (Okl.Cr.1999), which this Court later vacated and withdrew from publication.[13] That being so, we hereby grant leave for the filing of Appellant's Supplemental Brief, to the extent that it addresses issues previously raised in Appellant's appellate brief. However, Appellant also seeks to present a new proposition of error in this appeal, i.e. retroactive application of *Dodd*'s procedural guidelines, because *Dodd* decided an "issue of first impression." To the extent that Appellant's Supplemental Brief raises new propositions of error, his Application to File Supplemental Brief is denied because it was untimely-filed under Rule 3.4, i.e., more than thirty days after *Dodd*'s publication (January 6, 2000). Consequently, this Court will not consider portions of Appellant's Supplemental Brief raising new propositions or requesting new relief.

¶ 21 In response to the claims raised in proposition two, the motion for new trial, and Appellant's Supplemental Brief, this Court entered an Order Remanding For Evidentiary Hearing on August 24, 2000. Therein, this Court ruled:

> *Dodd*'s holding is not applicable to this proceeding. First, *Dodd*'s procedural discovery requirements do *not* apply retrospectively to Appellant's trial, which was held a year and three months prior to the time *Dodd* was handed down. Secondly, *Dodd*'s holding applies only to 'jailhouse informants.' Within the *Dodd* context, Poorboy does not qualify as a jailhouse informant.

We then explained that "the perceived danger addressed in *Dodd* was the incarcerated individual who might prey on an unsuspecting incarcerated defendant by obtaining incriminating statements the informant might use to benefit himself/herself." In other words, the Court in *Dodd* sought to deal with the "professional jailhouse informant," i.e., an informant who repeatedly testified on behalf of the State against fellow inmates in order to obtain leniency. In this case, Appellant's statements to Poorboy were not made while he was incarcerated, and his statements were made both prior to and after the murders. Our Order thus found the "fact Poorboy was in jail on unrelated charges at the time he gave his statement to police does not make him a jailhouse informant within the *Dodd* context."

¶ 22 Nevertheless, in our Order Remanding for Evidentiary Hearing, we recognized that, despite *Dodd*'s inapplicability:

> [D]ue process requires the State to disclose exculpatory and impeachment evidence favorable to an accused. *See United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d [104] (1972), *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Therefore, where there is evidence of bad faith on the part of the State by the deliberate concealment of a deal to be consummated in the future, due process may be implicated. In such cases, a court should look at the materiality of the nondisclosed information and ask if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

---

**13.** All references hereinafter to *"Dodd"* will be referring to *Dodd v. State,* 2000 OK CR 2, 993 P.2d 778, not the earlier vacated opinion.

different. *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383; *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999); *see also* 22 O.S.1991, § 952 (discussing verdicts rendered against a defendant in which substantial rights have been prejudiced.)

In the instant case, Appellant raised his allegations of an undisclosed agreement between the government and a material witness in his motion for new trial. This is the proper procedure to use with allegations of this type. However, Appellant's motion was subsequently summarily overruled by the trial court, with an exception granted. As a result, we have no evidence in the record to support Appellant's allegations or the trial court's ruling. Such evidence is contemplated by 22 O.S.1991, § 952(7). Moreover, the trial court did not rule on the materiality of the factual allegations within Appellant's motion for new trial or address its prejudicial effect, if any, on the verdict.

Thus, due to the unique facts and factual allegations of this case, along with the unusual legal circumstances presented, i.e., the publication, withdrawal, and issuance of new opinions in both *Singleton* and *Dodd* during the pendency of this appeal, we found the interest of justice entitled Appellant to an evidentiary hearing on his claims, pursuant to Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18 (2000). We listed six questions to be resolved at the evidentiary hearing: (1) Did the State enter into an undisclosed agreement with Jason Poorboy with respect to the testimony he would give at Appellant's trial? (2) If so, what was the nature of that agreement? (3) Did the prosecution willfully or inadvertently withhold exculpatory or impeachment evidence favorable to Appellant, relating to the testimony of Jason Poorboy? (4) Prior to Appellant's trial, did the prosecution fully intend to offer a "deal" to Poorboy if he testified favorably to the State? (5) were Appellant's substantial rights prejudiced by the prosecution's actions in relation to Jason Poorboy? and (6) any other matter deemed relevant to this inquiry by the trial court.

¶ 23 The evidentiary hearing was held on September 26 and 27, 2000 before The Honorable Jesse S. Harris, District Judge, Tulsa County. The trial judge announced his findings of fact and conclusions of law on October 20, 2000 and the same were filed in this Court on November 30, 2000. The trial judge ruled as follows:

1. The State of Oklahoma did not enter into an undisclosed agreement with Jason Poorboy with respect to the testimony he would give at the trial of the Defendant. Both of the State prosecutors (Mark Collier and John Heil) that tried the Defendant's case denied making an offer of a specific agreement to Jason Poorboy and/or his lawyer. Both of the prosecutors had no idea what kind of sentence Jason Poorboy would receive for his testimony until after the trial of the Defendant was completed. Both Jason Poorboy and his lawyer, Peter Brangaccio, have denied there was even a discussion of a specific agreement between themselves and the two prosecutors as an incentive for Mr. Poorboy's testimony against the Defendant.

2. Since there was not an undisclosed agreement between the State prosecutors and Jason Poorboy this Court is obviously unable to described the nature of a nonexistent agreement.

3. The prosecution did not willfully or inadvertently withhold exculpatory or impeachment evidence favorable to the Defendant, relating to the testimony of Jason Poorboy. The testimony at the evidentiary hearing held by this Court indicates the Defendant's lawyers were informed of the bond increase and the bond reduction on Jason Poorboy prior to the trial of the Defendant. The testimony from the evidentiary hearing also indicates Mr. Wallace, a lawyer for the Defendant, knew everything the prosecutors knew relating to discussions of consideration between the prosecutors and the lawyer for Jason Poorboy and/or specifically between the prosecutors and Jason Poorboy. Finally, the Defendant suggests the availability of Mr. Poorboy's lawyer, Peter Brangaccio, could have been useful for impeachment purposes at trial. This Court finds the unavailability of Jason Poorboy's lawyer for testimony on behalf of the Defendant is also not a willful or inadvertent act of

withholding impeachment evidence on the part of the State prosecutors.

4. Based upon the testimony of the evidentiary hearing, the Court finds the State prosecutors did fully intend to offer a deal to Jason Poorboy if he testified favorably for the State. It is clear from the testimony of both State prosecutors, Mr. Collier and Mr. Heil, that Jason Poorboy would receive consideration if he testified to what they believed to be the truth. Additionally, Peter Brangaccio, the lawyer for Mr. Poorboy, testified Assistant District Attorney Mark Collier had told him if Jason Poorboy testified truthfully, it would be taken into consideration.

5. The Court finds substantial rights of Jackie Leland Wright were not prejudiced by the prosecutions' actions in this case. The defense lawyers were notified prior to the Defendant's trial that the prosecution had talked to Jason Poorboy. The defense lawyers were made aware of Jason Poorboy's bond increase and bond reduction prior to the Defendant's trial. The defense lawyers were informed by the State prosecutors of the discussions of consideration that had taken place with Jason Poorboy and/or his lawyer prior to Mr. Poorboy's testimony at the Defendant's trial. The testimony from the evidentiary hearing held by this Court clearly indicates the lawyers for the Defendant were informed prior to trial of every conversation between the prosecution and Jason Poorboy or his lawyer that related to any deal, consideration, or cooperation. The only exception to this finding is that the Court does determine the State prosecutors did not inform the lawyers for the Defendant as to the manner in which discussions of consideration were initiated by the Tulsa County District Attorney's Office with the lawyer for Mr. Poorboy.

6. Based upon the testimony and the exhibits admitted during the evidentiary hearing and the findings and conclusions previously stated, this Court finds the verdicts at trial are not rendered suspect nor were the trial proceedings unreliable. Therefore it is this Court's decision the Defendant has not met his burden of proof and the Court will deny the Defendant's request for new trial.

Appellant has since filed a Supplemental Brief on Remand with this Court. The State was given the opportunity to respond, but inexplicably declined.

¶ 24 To support his claims in this proposition, Appellant points to the following facts taken from the record, relating to Jason Poorboy: Poorboy was contacted on numerous occasions by State authorities and denied having knowledge about Appellant's involvement in the murders; soon after Appellant's arrest, Poorboy was arrested on unrelated charges of Assault with a Dangerous Weapon and Possession of Marijuana, after former felony conviction, and he was facing ten years to life; Poorboy was released from custody on those charges; on August 13, 1998, one of the prosecutors in Appellant's case argued to a magistrate that Poorboy's bond should be raised from $10,000 to $100,000 because he was a danger to the community; Poorboy's bond was subsequently raised to $100,000; Poorboy was taken into custody and remained there until September 24, 1998; on that day, Poorboy's attorney worked out a bond reduction arrangement with prosecutors whereby Poorboy would provide them with a statement implicating Appellant in the instant crime; Poorboy's bond reduction and statement came about as a result of prosecutors calling Poorboy's attorney and telling the attorney if Poorboy wanted any type of deal regarding his pending felonies, he had to give a statement that day, the last day of discovery in the instant case; Poorboy's statement implicated Appellant in the crimes; Poorboy's statement was the first one he gave that implicated Appellant and it was given while Poorboy was in custody; after Poorboy's statement was given, prosecutors asked to lower his bond back to $10,000 and he was released from custody; at Appellant's trial, Poorboy testified he was not promised anything on his pending felonies in exchange for his testimony, although he was "hopeful for some type of consideration;" Poorboy's felony cases were passed until after Appellant's trial; after Appellant's trial, the State dismissed the Assault with Deadly Weapon charge against Poorboy; Poorboy pled guilty to the Possession of Marijuana charge, after the allegation of former conviction was

dropped; Poorboy received a ten-year suspended sentence; the trial court found, at the evidentiary hearing, that the State prosecutors failed to inform Appellant's lawyers as to the manner in which discussions of "consideration"[14] were initiated by the prosecutors with Appellant's attorney; and the trial court also found that "the state prosecutors did fully intend to offer a deal to Jason Poorboy if he testified favorably to the State."[15]

¶ 25 However, the record reflects that many of these details were disclosed to the jury. At the time of trial, the jury was apprised of the following material facts with respect to Poorboy: he had a prior felony conviction for assaulting a police officer; he had pending charges for assault with a dangerous weapon and marijuana possession; he had first spoken to the prosecutor in the last two weeks, even though he had information regarding the murders for eight or nine years; he had no deal, but was "hoping for some kind of consideration" for his testimony; he had known Appellant for a few years and Bastion for a few months at the time of the crime; the three men were friends and spent a lot of time together; he and Appellant were Bastion's only friends; he, Appellant, and Bastion had burglarized Tulsa Expediting two weeks before the murder of Coy and Tonya Wilkerson; the trio stole a gun during the robbery, and there was an understanding the gun was his; they all shot the gun; the trio discussed a home burglary and the possibility of killing someone "if people were there;" Poorboy knew a great deal about how the murders occurred, supposedly through conversations with Appellant; the gun from Tulsa Expediting was used in the murders; he hung out with Appellant and Bastion after the murders, and was together with Bastion in the early morning after the homicides occurred; he lived next door to Bastion; he had been out on bond on his pending felonies, but Appellant's prosecutor,

Mr. Heil, had asked for Poorboy's bond to be increased by claiming he was a danger to the community; his bond was increased to $100,000 and he went back to jail; he did not like being in jail; after he gave a statement to prosecutors in the instant case, his bond was reduced to $10,000 and he was released; he had received something for cooperating in this case, a $90,000 bond reduction; his marijuana case had been continued until after Appellant's trial; prior to giving his statement, he had denied knowing about the Wilkinson homicides; and it was the prosecutors who contacted Poorboy's attorney about obtaining what Poorboy knew about the murders.

¶ 26 At the evidentiary hearing, the witnesses discussed four types of arrangements the State typically makes with potential witnesses who have pending felonies, such as Jason Poorboy. First, a witness may be told that if he testifies favorably, i.e., consistent with what the prosecutors believe to be the truth, the State will in fact make a specific recommendation on his pending felonies, such as five years imprisonment. Second, a witness's lawyer may be told that if his client testifies favorably, the State will make a specific recommendation, but that the lawyer is not permitted to tell his client about the recommendation. Third, the witness may be told that if he testifies favorably, the prosecutors will consider his cooperation at the time of making a recommendation to the judge. And fourth, a witness may be told that if he testifies favorably, he need not worry about his pending cases.

¶ 27 Appellant claims his case falls into the third category. Furthermore, Appellant claims that, at a minimum, a promise is implied in such an arrangement, i.e., that the prosecution would be lenient with Poorboy if he testified favorably for their case.

---

14. One of the problems in this case is the use of the ambiguous term "consideration." That term can obviously be used in a legal sense to demonstrate an agreement was reached, because most legally enforceable contracts require some form of valuable consideration. *See, e.g.,* 15 O.S.1991, § 101; 15 O.S.1991, § 106. On the other hand, the term consideration can also be understood to mean that the State would merely take Poorboy's testimony into consideration, i.e., to deliberate upon it when later making a recommendation to the trial court regarding Poorboy's pending felonies. The word was used both ways by the parties at the evidentiary hearing.

15. O.R. at 122–24; Tr. III at 72–73, 125–31, 140, 148–49; Tr. IV at 251–53; Evidentiary Hearing Tr. at 10, 30–31, 40–41.

¶ 28 This proposition really boils down to two issues: (1) whether the State made an undisclosed "deal" with Poorboy regarding his pending felony convictions; and (2) if so, whether the failure to disclose that deal and/or the failure to disclose the "manner in which discussions of consideration were initiated" by prosecutors with Appellant's attorney are material facts that undermines this Court's confidence in the trial outcome.

¶ 29 Regarding the existence of an undisclosed deal, Poorboy's attorney testified at the evidentiary hearing that "[a]t no time did Mark Collier make any specific promise or deal or offer regarding any recommendation he would make in the pending criminal matters against Jason Poorboy ... Jason coming forward to testify was an act of faith on his part. He had no promise, no guarantee whatsoever as to what would happen on his pending criminal matters." [16] However, Mr. Collier did make known to him, if Poorboy testified truthfully for the State, that he would take that into consideration.[17] Poorboy and his counsel had no idea what that would mean, although Poorboy "certainly hoped" to get something.[18]

¶ 30 On this same point, the prosecutor, Mr. Collier, testified that he specifically told Poorboy:

> I can't promise you anything. All you're going to have to do is trust that I'll treat you fairly, is what I said. I can't promise you that I'll give you any consideration. I know that you're doing this in anticipation for consideration. I certainly will consider it if I think you've testified truly and honestly, but I'm not going to promise that or anything else ... I never promised him anything directly, never told him he was going to get any consideration. I know that he was anticipating it, but I never promised him or guaranteed him anything.[19]

Mr. Collier testified, "I had no idea what I intended to do with Mr. Poorboy. It was the last thing on my mind." [20] He decided what they would specifically recommend sometime after Appellant's trial.

¶ 31 Although Mr. Collier was somewhat inconsistent in his testimony regarding the use of the term "consideration," [21] it appears he was generally using that word to mean he would "take it into account." He admitted there had never been a time when a witness such as Poorboy had testified favorably and Mr. Collier had not considered it. Indeed, Mr. Collier testified Poorboy had the right to expect that Mr. Collier would consider it. He also admitted the difference between a "deal" and "consideration" was a matter of semantics.

¶ 32 Furthermore, Mr. Collier testified "[e]very conversation that we had in terms of any deal, consideration, cooperation was disclosed with Mr. Wallace beforehand. He knew everything that I knew." [22] Mr. Collier also testified about telling Appellant's counsel before trial that "if Mr. Poorboy testified truthfully, he would take that into consideration." [23]

¶ 33 The trial court found that the prosecutors "did fully intend to offer a deal to Jason Poorboy if he testified favorably for the State." We find this issue to be fairly supported by the record, especially in light of the loose use of the term consideration.

¶ 34 More importantly, however, the trial court found the State of Oklahoma did not enter into an undisclosed agreement with Jason Poorboy with respect to the testimony he would give at Appellant's trial. The trial court also found the State prosecutors had no idea what kind of sentence would be offered to Jason Poorboy until after Appellant's trial and that no specific terms were discussed between the State and Poorboy's attorney.

¶ 35 These factual findings are supported by the record, and we agree with the trial court's conclusions on this point. We find no evidence of an undisclosed agreement between the State and Poorboy or his attorney.

---

16. Evidentiary Hearing Tr. at 58, 60.

17. Evidentiary Hearing Tr. at 59.

18. Evidentiary Hearing Tr. at 60–61.

19. Evidentiary Hearing Tr. at 43.

20. Evidentiary Hearing Tr. at 45.

21. *See* Evidentiary Hearing Tr. at 43, 45, 53–54.

22. Evidentiary Hearing Tr. at 49.

23. Evidentiary Hearing Tr. at 53.

Poorboy was never told what, if anything, he could expect in relation to his pending felonies. He was never told when, if ever, he could expect the State to act. Furthermore, the evidentiary hearing testimony indicates that, to the extent any of the State's discussions with Poorboy could be considered an agreement, those discussions were disclosed to Appellant's counsel.

¶ 36 We agree there are elements of an implied contract here.[24] Although no express terms were mentioned, the course of dealings between the State and indigent defense counsel indicates that Jason Poorboy had every reason to expect the State would deal favorably with him in the future. However, the evidentiary hearing clearly indicates this fact was known by both sides. Appellant's attorney did an effective job of presenting this issue to the jury. Given what is known by both sides regarding such arrangements, defense counsel could have gone even further.

██ ¶ 37 However, on the second point, the trial court found the State prosecutors failed to inform Appellant's lawyers "as to the manner in which discussions of consideration were initiated" by the Tulsa County prosecutors with Jason Poorboy's attorney.[25] Nevertheless, the trial court ruled that Appellant's substantial rights had not been prejudiced and the trial verdict was not rendered suspect by this non-disclosure.

██ ¶ 38 The State should have disclosed, to the extent it actually happened, the fact that Poorboy had been told that this was his last chance to give a statement, for such evidence might have been useful in impeaching the witness. *See United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985) (finding the duty to disclose evidence favorable to an accused encompasses impeachment evidence as well as exculpatory evidence). In such cases, the Court looks at the materiality of the non-disclosed information and asks if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of

the proceeding would have been different. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383; *see also Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.").

██ ¶ 39 Here, after careful thought and deliberation, we find the non-disclosed information was not material in the *Bagley* sense, i.e., Appellant received a verdict worthy of confidence even in its absence. As shown above, Appellant's jurors knew Jason Poorboy had a great amount of pressure placed upon him from the State in order to obtain his statement. Jurors were apprised that Poorboy was a possible suspect in the crime and that he stood to gain a great deal by testifying. They knew State prosecutors reduced Poorboy's bond in response to the favorable statement he gave and that Poorboy was hoping to receive consideration on his pending felonies. They were told of his prior felony conviction and his prior inconsistent statement. Furthermore, they were instructed that an informer's testimony is to be examined and weighed with greater care than the testimony of an ordinary witness. We cannot say their being unaware that Poorboy's statement was given on the last possible day undermines our confidence in the verdict.

¶ 40 That being so, we find any possible error pertaining to the non-disclosure of this information did not affect the outcome of this proceeding and is harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

██ ¶ 41 In his third proposition, Appellant claims the trial court erred in failing to suppress Appellant's statements to Ms. Holt "insofar as her questioning of him amounted

---

**24.** Indeed, at one point, Mr. Collier testified, "I never promised him anything directly, never told him he was to going to get any consideration." Evidentiary Hearing Tr. at 43.

**25.** Appellant argues the State gave an "ultimatum" to Jason Poorboy, i.e., if Poorboy hoped for leniency on his pending felonies, he needed to make a statement against Jackie Wright now. This ultimatum is supported somewhat by the testimony of Mark Collier.

to custodial interrogation and he was not *Mirandized.*" Appellant raised this issue in a pretrial motion, which the trial court overruled.[26]

¶ 42 The record reflects that, after Appellant's arrest, Ms. Holt visited Appellant in the Tulsa County Jail on Tuesday, May 14, 1991.[27] Police officers did not ask her to come; Ms. Holt came down to the jail on her own to "witness" to Appellant.[28] Police officers allowed Ms. Holt to visit Appellant, but told her Appellant would probably not speak to her. Appellant did agree to speak to Ms. Holt, however. During their visit, Appellant admitted he was in the car Ms. Holt stopped when items from the Wilkerson home were being burned.[29] At trial, Ms. Holt identified Appellant as the person she spoke to in jail and as the person she saw in the vehicle on the night of the murder.

¶ 43 This proposition is without merit. First, Appellant's statements to Ms. Holt were not coerced, and Ms. Holt was not acting as an agent of the State or in an investigatory manner when she visited Appellant in jail. The exclusionary rule does not apply to voluntary statements of a defendant to private citizens. *McCubbin v. State,* 1984 OK CR 37, ¶ 16, 675 P.2d 461, 465. It is only when the State actively engages in prior arrangements with an informer to obtain desired information in contravention of constitutionally protected rights that the sanction of suppression of the evidence is applied. *Id.* Second, Ms. Holt's testimony was cumulative. Appellant had spoken to Officer Bob Jackson four days earlier and admitted this same information, after receiving the *Miranda* warnings.[30] Appellant has failed to show he was prejudiced by admission of this same evidence by another witness or that he was denied a fair trial. *Short v. State,* 1999 OK CR 15, ¶ 29, 980 P.2d 1081, 1095.

26.  5–27–98 Tr. at 8–11.

27.  Tr. IV at 88–89.

28.  Tr. IV at 90–91; Pr.H.Tr. at 46–51.

29.  Tr. IV at 91.

30.  State's Exhibit 40; Tr. IV at 110–122.

**DECISION**

¶ 44 The judgment and sentence are hereby **AFFIRMED.**

JOHNSON, V.P.J.: CONCUR.

CHAPEL, J.: DISSENT.

STRUBHAR, J.: CONCUR IN RESULT.

LILE, J.: CONCUR.

CHAPEL, JUDGE, DISSENTING:

¶ 1 Initially, I reject the claim that *Dodd* does not apply retrospectively to Wright's trial; instead, it must be applied to all cases pending on direct appeal.[1] The majority then restricts *Dodd's* applicability to cases involving "jailhouse informants." Although this limitation superficially appears reasonable given *Dodd's* use of that term, the rule is actually driven by the need to question and ensure the reliability of *any* informant testimony purchased in exchange for consideration. Consistent with this objective, the *Dodd* requirements were meant to and should apply to all informants offering evidence at trial for consideration.[2]

¶ 2 I would additionally require that the trial judge conduct a reliability hearing after the *Dodd* discovery, specifically considering the following factors: (1) whether the informant has received or will receive anything in exchange for testifying; (2) whether the informant has testified or offered evidence in other cases and any benefit there received; (3) the specificity of the informant's testimony; (4) the manner in which the statement from the defendant was obtained; (5) the degree to which the statement can be independently corroborated; (6) whether the informant has changed his testimony in this or any case; and (7) the informant's criminal history. After considering the evidence, the judge should determine whether the movant established the probable truthfulness of the informant's testimony. If not, the testimony

1.  *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)(new rule for conduct in criminal prosecution must be applied to all cases pending on direct review).

2.  Dodd requires that all pending or potential deals, inducements, or promises by any party to a criminal proceeding be disclosed before trial.

should be excluded. If so, the testimony should be admitted, leaving to the jury any lingering questions on the witness's credibility.

¶ 3 The majority next admits that the State contemplated a future deal with informant Poorboy. However, it appears that State and Poorboy had not agreed on the terms of this deal prior to trial. Poorboy merely "hoped" for leniency in his pending criminal charges. True, mere hope of a deal is insufficient to trigger the *Dodd* requirements, which require disclosure only when the prosecutor presently knows of a future offer. As such, *Dodd* was left with a void. Because such common "after-the-testimony" deals undermine confidence in the informant's testimony-the very problem *Dodd* seeks to curb[3]—I would not leave the void unfilled.

¶ 4 Occasionally, a prosecutor truly might not know what consideration (if any) the State will bestow upon an informant. Nevertheless, the potential for abuse should not escape notice. I would apply the newly-discovered evidence standard to cases where an informant receives post-trial consideration.

¶ 5 The newly-discovered evidence standard requires a retrial when the defendant acquires material evidence that was not and could not have been discovered before trial.[4] Applying this standard to post-trial plea agreements leads to the inescapable conclusion that these inducements will always be newly discovered, for that which the prosecutor did not know at trial could never be "discovered" by any defendant before trial, due diligence notwithstanding. Thus, the question in this circumstance will always be the materiality of the evidence. Evidence is material if it has a legitimate and effective influence on the outcome of the trial. The very existence of the *Dodd* protections proves the necessity of disclosing such critical information. So it is here. The State's post-trial deal with informant Poorboy was material, was "newly discovered", and thus a new trial is required.

¶ 6 The State's conviction hinged on Poorboy's testimony that Wright admitted the crime to him. The evidence shows the weakness of Poorboy's testimony from the beginning. He initially and repeatedly denied Wright's involvement in the crime. Upon later facing charges carrying substantial sentences and little prospect for bond, he recanted his earlier testimony and "revealed" Wright's "confession."[5] To what effect?

¶ 7 At the time of Wright's trial, Poorboy faced two charges: Assault with a Deadly Weapon and Possession of Marijuana after former conviction of a felony. The minimum sentence for each was ten years. After Wright's trial, the State dismissed the Assault charge, and Poorboy received a ten-year suspended sentence for the Marijuana charge. Poorboy's "hope" for leniency in exchange for his testimony became his ticket to freedom.

¶ 8 This subsequent development in Poorboy's good fortune further cripples faith in his veracity. Had the jury known Poorboy would fare so well after testifying against Wright, his already-impaired credibility would have been further damaged if not destroyed. In a close case such as this, where conviction rests primarily on one suspect witness who was not cross-examined on very damaging facts, I cannot be sure that the result of the underlying trial would be the same had those facts been known. I would reverse and remand Wright's convictions for a new trial.[6]

---

3. One could argue that post-testimony deals should not undermine confidence in informant testimony because if the informants don't know what benefit they will receive, they will testify truthfully. To the contrary, the shapeless specter of a potential deal actually incentivizes the informant to give whatever testimony the State seeks. The better the testimony, the better the deal.

4. See 22 O.S.1991, § 952.

5. As the majority opinion notes, Poorboy was cross-examined with his inconsistent statements, bond reduction agreement, and his "hope" for leniency on his pending charges in exchange for his plea.

6. I would also note that I concur with the Court's opinion in Proposition I. However, I do so only because (as the majority opinion notes in footnote 11) Appellate counsel omitted an issue. It does not appear from the record that Wright

received the statutorily-required notice of his right to apply for certification as a child. Failure to provide this notice is error. *Gilley v. State,* 848 P.2d 578, 580 (Okl.Cr.1992).