2007 OK CR 23

**Brenda Evers ANDREW, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2004–1010.**

Court of Criminal Appeals of Oklahoma.

June 21, 2007.

As Corrected July 9, 2007.

As Corrected on Denial of Rehearing Sept. 10, 2007.

Greg McCracken, George Miskovsky, III, Andrea D. Miller, Oklahoma City, OK, attorneys for defendant at trial.

Fern Smith, Gayland Gieger, Assistant District Attorneys, Oklahoma County, Oklahoma City, OK, attorneys for the State at trial.

William H. Luker, James H. Lockard, Sandra Mulhair Cinnamon, Capital Direct Appeals Division, Indigent Defense System, Norman, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Seth S. Branham, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## OPINION

LEWIS, Judge.

¶ 1 Appellant, Brenda Evers Andrew, was charged with First–Degree (malice) Murder in violation of 21 O.S.2001, § 701.7(A), and Conspiracy to Commit First Degree Murder in violation of 21 O.S.2001, § 421, in Oklahoma County District Court Case No. CF–2001–6189.[1] The State filed a Bill of Particulars alleging the existence of three (3) aggravating circumstances: (1) that the person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration; (2) the murder was especially heinous, atrocious, or cruel; and (3) the existence of the probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society. *See* 21 O.S.2001, § 701.12(3), (4) and (7).

¶ 2 A jury trial was held before the Honorable Susan W. Bragg, District Judge, in June and July 2004. The jury found Appellant guilty of both counts, and found the existence of two aggravating circumstances: the murder was for remuneration and the murder was especially heinous, atrocious, or cruel. The jury set punishment at death on the first-degree murder count and ten (10) years and a $5000.00 fine on the conspiracy count. Judge Bragg formally sentenced Appellant in accordance with the jury verdict on September 22, 2004.[2]

## I. FACTS

¶ 3 Appellant's husband Robert ("Rob") Andrew was shot to death at their Oklahoma

---

1. Andrew was charged conjointly with James Dwight Pavatt. The two defendants were severed for trial. Pavatt was convicted of both counts, received the death penalty, and appealed his Judgment and Sentence, which was affirmed in *Pavatt v. State*, 2007 OK CR 19, 159 P.3d 272.

2. Andrew's appeal brief was filed on February 21, 2006 and the State's brief was filed on June 21, 2006. Andrew filed a reply brief on July 10, 2006. Oral argument was held on January 30, 2007.

City home sometime around 7:00 p.m. on November 20, 2001. Appellant was also shot in the arm during this incident.

¶ 4 The Andrews were separated at the time and Rob Andrew was at the home to pickup the two minor children for visitation over the Thanksgiving holiday. The custom was that Appellant would bring the children out to the car and Rob would take them from there. However, on this night, Appellant asked Rob Andrew to come into the garage to light the pilot light on the furnace because it had gone out.

¶ 5 Appellant's version of the events from that point on was that as Rob was trying to light the furnace, two masked men entered the garage. Rob turned to face the men and was shot in the abdomen. He grabbed a bag of aluminum cans to defend himself and was shot again. Appellant was hit during this second shot.

¶ 6 Undisputed facts showed that after that, Appellant called 911 and reported that her husband had been shot. Emergency personnel arrived and found Rob Andrew's body on the floor of the garage; he had suffered extensive blood loss and they were unable to revive him. Appellant had also suffered a superficial gunshot wound to her arm. The Andrew children were found in a bedroom, watching television with the volume turned up very high, oblivious to what had happened in the garage.

¶ 7 Appellant was taken to a local hospital for treatment. Her behavior was described by several witnesses, experienced in dealing with people in traumatic situations, as uncharacteristically calm for a woman whose husband had just been gunned down.

¶ 8 Rob Andrew was shot twice with a shotgun. A spent 16–gauge shotgun shell was found in the garage on top of the family van. Rob Andrew owned a 16–gauge shotgun, but had told several friends that Appellant refused to let him take it when they separated. Rob Andrew's shotgun was missing from the home. One witness testified to seeing Appellant at an area used for firearm target practice near her family's rural Gar-

field County home eight days before the murder and he later found several 16–gauge shotgun shells at the site.

¶ 9 Appellant's superficial wound was caused by a .22 caliber bullet, apparently fired at close range, which was inconsistent with her claim that she was shot at some distance. About a week before the murder, Pavatt purchased a .22 caliber handgun from a local gun shop. Janna Larson, Pavatt's daughter testified that, on the day of the murder, Pavatt borrowed her car and claimed he was going to have it serviced for her. When he returned it the morning after the murder, the car had not been serviced, but Larson found one round of .22 caliber rimfire ammunition on the floorboard. In a conversation later that day, Pavatt told Larson never to repeat that Appellant had asked him to kill Rob Andrew, and he threatened to kill Larson if she did. He also told her to throw away the .22 round she found in her car.

¶ 10 Police searched the home of Dean Gigstad, the Andrews' next-door neighbor, after the Gigstads reported finding suspicious things in their home. Police found evidence that someone had entered the Gigstads' attic through an opening in a bedroom closet. A spent 16 gauge shotgun shell was found on the bedroom floor, and several .22 caliber rounds were found in the attic itself. There were no signs of forced entry into the Gigstad home. Gigstad and his wife were out of town when the murder took place, but Appellant had a key to their home. The .22 caliber round found in Janna Larson's car was of the same brand as the three .22 caliber rounds found in the Gigstads' attic; the .22 caliber bullet fired at Appellant and retrieved from the Andrews' garage appeared consistent with bullets in these unfired rounds. These rounds were capable of being fired from the firearm that Pavatt purchased a few weeks before the murder; further testing was not possible because that gun was never found. The 16 gauge shotgun shell found in the Gigstads' home was of the same brand as the 16 gauge shell found in the Andrews' garage. Ballistics comparison showed similar markings, indicating that they could have been fired from the same

weapon. Whether these shells were fired from the 16–gauge shotgun Rob Andrew had left at the home was impossible to confirm because, as noted, that gun remains missing.

¶ 11 Within days after the shooting, before Rob Andrew's funeral, Appellant, James Pavatt and the two minor children left the State and crossed the border into Mexico. They were apprehended while attempting to re-enter the United States in late February 2002.

¶ 12 Appellant and Pavatt met while attending the same church. At some point they began teaching a Sunday school class together. Appellant and Pavatt began having a sexual relationship.[3] Around the same time, Pavatt, a life insurance agent, assisted Rob Andrew in setting up a life insurance policy through Prudential worth approximately $800,000. In late September 2001, Rob Andrew moved out of the family home, and Appellant initiated divorce proceedings a short time later.

¶ 13 Janna Larson, Pavatt's adult daughter, testified that in late October, Pavatt told her that Appellant had asked him to murder Rob Andrew. On the night of October 25–26, 2001, someone cut the brake lines on Rob Andrew's automobile. The next morning, Pavatt persuaded his daughter to call Rob Andrew from an untraceable phone and claim that Appellant was at a hospital in Norman, Oklahoma, and needed him immediately. An unknown male also called Rob that morning and made the same plea. Rob Andrew's cell phone records showed that one call came from a pay phone in Norman (near Larson's workplace), and the other from a pay phone in south Oklahoma City. Rob Andrew discovered the tampering to his car before placing himself in any danger. He then notified the police. The next day, Appellant told Rob that she read in the newspaper that someone cut his brakes, but no media coverage of this event had occurred.

¶ 14 One contentious issue in the Andrews' relationship was control over the insurance policy on Rob Andrew's life. After his brake lines were cut, Rob Andrew inquired about removing Appellant as beneficiary of his life insurance policy. Rob Andrew spoke with Pavatt's supervisor about changing the beneficiary. He also related his suspicions that Pavatt and Appellant were trying to kill him. At trial, the State presented evidence that in the months preceding the murder, Appellant and Pavatt actually attempted to transfer ownership of the insurance policy to Appellant without Rob Andrew's knowledge, by forging his signature to a change-of-ownership form and backdating it to March 2001.[4]

¶ 15 In the days following the murder, Pavatt obtained information over the Internet about Argentina, because he had heard that country had no extradition agreement with the United States. Larson also testified that after the murder, Appellant and Pavatt asked her to help them create a document, with the forged signature of Rob Andrew, granting permission for his children to travel with Appellant out of the country. Appellant also asked Larson to transfer funds from her bank account to Larson's own account, so that Larson might wire them money after they left town.

¶ 16 Appellant did not attend her husband's funeral, choosing instead, to go to Mexico with Pavatt and the children. Pavatt called his daughter several times from Mexico and asked her to send them money. Larson cooperated with the FBI and local authorities in trying to track down the pair.

¶ 17 After her apprehension, Appellant came into contact with Teresa Sullivan, who was a federal inmate at the Oklahoma County jail. Sullivan testified that Appellant told her that she and Pavatt killed her husband for the money, the kids, and each other. Appellant also told her that Pavatt shot her

3. The State presented evidence that the Andrews' marriage had been strained for several years, and that Appellant had had a number of extra-marital affairs.

4. According to one witness, Appellant had told her husband that she could sign his name "better than he could." Among other evidence, the State presented recordings of telephone conversations from Appellant and Pavatt to the insurance company's home office, inquiring about the status of the policy and attempting to persuade them that a legitimate ownership change had been made.

in the arm to make it look as if she was a victim.

¶ 18 Expert testimony opined that the wound to Appellant's arm was not self-inflicted, but was part of a scheme to stage the scene to make it look like she was a victim, just like her husband. Additional facts will be discussed as relevant to Appellant's propositions of error.

## II. CHANGE OF VENUE ISSUE

■■■ ¶ 19 In proposition ten, Appellant claims the trial court erred in not granting her request for a change of venue. Prior to trial, Appellant filed a motion for a change of venue. The trial court held a hearing on the motion January 9 and 21, 2003. The defense presented evidence of the extensive coverage of the case in the local media, as well as polling data showing that a substantial number of Oklahoma County residents were somewhat familiar with the case and had opinions about the case. After considering this evidence, the trial court denied the motion, stating:

> I don't think we're going to know [whether unbiased jurors can be seated] until such time as we bring in a large panel, put them up in the jury box and *voir dire* them. It's unfortunate but that's actually the only way ... that you can make that determination.

¶ 20 We review the trial court's denial of Appellant's motion for change of venue for an abuse of discretion. *DeRosa v. State*, 2004 OK CR 19, ¶ 21, 89 P.3d 1124, 1135–36. Pretrial publicity alone does not warrant a change of venue. *United States v. McVeigh*, 918 F.Supp. 1467, 1473 (W.D.Okl.1996) ("Extensive publicity before trial does not, in itself, preclude fairness"). The influence of the news media must be shown to have actually pervaded the trial proceedings. *Hain v. State*, 1996 OK CR 26, ¶ 8, 919 P.2d 1130, 1136. We consider all relevant evidence to determine whether a fair trial was possible at that particular place and time, keeping in mind the ultimate issue: whether the trial court was in fact able to seat twelve qualified jurors who were not prejudiced against the accused. *DeRosa*, 2004 OK CR 19, ¶ 19, 89 P.3d at 1135 ("if a trial court denies a defen-

dant's change of venue motion and the defendant is then tried and convicted, the question is no longer about hypothetical and potential unfairness, but about what actually happened during the defendant's trial").

¶ 21 From the beginning, this case received considerable attention in the local media. That fact cannot be disputed. Appellant refers us generally to the record of the hearing on her change-of-venue motion, but she does claim that air of prejudice pervaded the trial proceedings themselves. Again, our chief concern is not how, or how often, the case played in the media, but whether, at the end of the day, the trial court was able to empanel twelve fair and impartial jurors.

■■■ ¶ 22 The trial court is entitled to considerable discretion on issues involving jury selection, because it personally conducts *voir dire* and has the opportunity to observe the demeanor of the panelists—so much of which is lost in the transcription of the proceedings. *Harris v. State*, 2004 OK CR 1, ¶ 11, 84 P.3d 731, 741. Nowhere in her brief does Appellant claim, much less demonstrate, that any juror actually seated was biased against her due to adverse pretrial publicity. Instead, Appellant invites this Court to hold that, because of extensive media coverage, prejudice should be presumed. We decline that invitation and hold that the trial court did not abuse its discretion in denying a change of venue.

## III. FIRST STAGE ISSUES

■■■ ¶ 23 In propositions two through five and seven through nine, Appellant claims that improper, irrelevant and inadmissible evidence was introduced during the first stage of trial. The admission of evidence is reviewed under an abuse of discretion standard. The introduction of evidence is left to the sound discretion of the trial court; the decision will not be disturbed absent an abuse of that discretion. *Pickens v. State*, 2001 OK CR 3, ¶ 21, 19 P.3d 866, 876. An abuse of discretion is "a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented." *C.L.F. v. State*, 1999 OK CR 12, ¶ 5, 989 P.2d 945, 946.

188

¶ 24 A trial court can exercise discretion only when an attempt to introduce evidence is met with a contemporaneous objection; otherwise, this Court's review is limited to a review for plain error. *Lott v. State*, 2004 OK CR 27, ¶ 69, 98 P.3d 318, 340. Plain error is that error which is plain from the record, and which goes to the foundation of the case or takes from a defendant a right essential to his defense. *Simpson v. State*, 1994 OK CR 40, ¶ 23, 876 P.2d 690, 698. Thus, alleged evidentiary errors which are preserved by objection are reviewed differently than alleged evidentiary errors which were not met with an objection.

¶ 25 Much of the evidence complained of here was introduced to show the relationship between Appellant and the victim and the relationship between Appellant and Pavatt. Evidence of these relationships and evidence of Appellant's prior "bad acts" was introduced to show Appellant's motive and her intent to kill her husband. The evidence was also relevant to show Appellant's preparation prior to the killing and the schemes she used to enter into a conspiracy with Pavatt to kill Rob Andrew.

**A.**

¶ 26 We begin our discussion with Appellant's complaint about the introduction of hearsay statements of the deceased, which is raised in proposition two. Appellant claims that the introduction of the hearsay statements of the deceased allowed the decedent to testify, through others, as an accuser. *See Shepard v. United States*, 290 U.S. 96, 104, 54 S.Ct. 22, 25–26, 78 L.Ed. 196 (1933). The statements addressed in *Shepard* are quite different from the statements here. In *Shepard*, the victim, while still alive and not anticipating death stated, "Dr. Shepard has poisoned me." [5]

¶ 27 Appellant's claim is broken down into different subject matters. We start with testimony concerning Rob Andrew's 16 gauge shotgun. The fact that Rob Andrew owned a 16 gauge shotgun was not in dispute. The fact that he was killed by a 16 gauge shotgun was also undisputed. This fact is significant given the fact that the 16 gauge is less common than the 12 or 20 gauge shotgun and the fact that Rob Andrew's shotgun and the murder weapon were never recovered. The statements revolve around Rob Andrew's desires, expressed to witness Ron Stump, to get his shotgun out of the marital home, after Appellant had changed the locks and security codes. Rob told Ron that Appellant would not let him have the shotgun. The statement was made just a week prior to the murder. However, the statement was introduced to show that Rob did not have the shotgun; inferring that it was still in Appellant's control.

¶ 28 The State admits that statements made by Rob regarding Appellant's refusal to allow him into the house to retrieve his shotgun went beyond the state-of-mind exception. They did not address whether the statement was offered for the truth of the matter asserted. Nevertheless, any error in the admission of these statements was harmless given the fact that there was a substantial amount of evidence that the shotgun was in the possession of Appellant and not in the possession of Rob Andrew. Appellant told police that, if the shotgun were still at the house, it was in the hall or bedroom closet. Also during the first part of September, 2001, as Rob was moving out of the home, witness James Higgins saw the shotgun in the bedroom closet.

¶ 29 Coupled with this claim is an argument regarding Rob's statement to Ron Stump that Appellant had finally found someone to kill him (referring to Pavatt). This statement was made just shortly after Rob had moved out of the house. This statement is clearly a statement showing Rob's state-of-mind at the time. "Such antecedent declarations by a decedent are admissible in a homicide case to show the decedent's state of mind toward the defendant or to supply the motive for killing." *Welch v. State*, 2000 OK CR 8, ¶ 28, 2 P.3d 356, 370.

[5]. The *Shepard* Court stated, "The admission of this declaration, if erroneous, was more than unsubstantial error. As to that the parties are agreed. The voice of the dead wife was heard in accusation of her husband, and the accusation was accepted as evidence of guilt. If the evidence was incompetent, the verdict may not stand." *Shepard*, 290 U.S. at 98, 54 S.Ct. at 23.

Testimony showing ill feeling, threats, or similar conduct by one spouse toward another in a marital homicide case is relevant and statements by the deceased expressing fear of a spouse are admissible under the state of mind exception to the hearsay rule.

*Washington v. State,* 1999 OK CR 22, ¶ 36, 989 P.2d 960, 973.

¶ 30 Appellant next claims that hearsay evidence concerning Rob Andrew's belief that Appellant and James Pavatt tried to kill him by cutting the brake lines to his car, were inadmissible. These taped statements were introduced through Prudential employees. Again this evidence was introduced to show Rob Andrew's state-of-mind. His fear of Appellant and Pavatt, and the motive for this killing: the insurance money. The conversations Rob had with the insurance company were introduced to show why Appellant had a motive to kill Rob. He was trying to keep Appellant from being the primary beneficiary to the life insurance policy. The conversation shows why he would try to change the beneficiary to his brother. The phone calls were also introduced to show why the insurance company would not change the beneficiary over the phone at Appellant's request—increasing her anger and resentment of Rob Andrew.

¶ 31 Appellant also claims that Rob's statements to the police that he believed that Appellant and Pavatt were responsible were testimonial in nature, and thus, in violation of *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). *Crawford* held that testimonial hearsay violates the confrontation clause. *Id.* at 51–52, 124 S.Ct. at 1364. Rob's belief was supported by the evidence in this case. The jury would have reached the same conclusion absent this testimony. The introduction of this testimony was harmless beyond a reasonable doubt, considering the mountain of evidence leading to the conclusion that Appellant was responsible, in part, for the brake line incident. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710–711 (1967). The inclusion of this evidence also showed the inadequacy of the police in their ability to stop Appellant and Pavatt before

they actually carried out their plan to kill Rob Andrew. *Crawford* does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. *Crawford,* 541 U.S. at 59, fn. 9, 124 S.Ct. at 1369, fn. 9, *citing Tennessee v. Street,* 471 U.S. 409, 414, 105 S.Ct. 2078, 2081–82, 85 L.Ed.2d 425 (1985). The inclusion of this testimony does not require reversal.

¶ 32 One of Appellant's main complaints concerns the testimony of attorney Craig Box. Rob Andrew hired Box to represent him in divorce proceedings against Appellant. Box testified that Andrew told him about a series of calls from Appellant and Pavatt, which led him to believe that they were responsible for the brake line incident and attempt on his life. The State agrees that the statements constituted inadmissible hearsay, but were harmless, nonetheless.

¶ 33 These statements supported the conspiracy charge by showing when an agreement may have been consummated. They also support the theory that the motive for murder was the insurance money. Thus the possibility exists that they were not introduced for the truth of the matter asserted. Nevertheless, if inadmissible, overwhelming admissible evidence was introduced to support these claims, including statements by Appellant confirming her vitriolic hatred for Rob and her desire to be the beneficiary of the insurance policy. Furthermore, tape recordings of Pavatt trying to change the ownership of the insurance policy with Prudential; his threats toward Rob; and statements he made concerning Appellant's request that he kill Rob were properly admitted.

¶ 34 The same can be said of other statements Rob made to others about the trouble he was having in changing the beneficiary of the policy. This is especially true in light of the evidence of falsified change of ownership papers, and Appellant's statements that she could sign Rob's name as well as he could and the fact that she routinely signed his name on employment related items.

¶ 35 The remainder of the statements Rob made to others about being kicked out of the house; Appellant hiding money; Rob's state-

ments regarding Appellant's belief that he was having a homosexual affair; his statements about Appellant's affair with Nunley; and Rob's statements regarding the changing of the locks and Appellant's refusal to let him see the children, constituted inadmissible hearsay, for which no exception existed; however, they were also harmless considering the amount of admissible evidence on these issues.

¶ 36 Appellant next challenges the admission of Rob's computer journal. This was admitted as part of a police report admitted as State's exhibit 205, over defense objection. The State points out that defense counsel referred to the journal long before it was admitted into evidence by referring to portions which say that Appellant was a good mom and the spiritual leader of the home. Defense counsel asked questions about entries in the journal and actually read portions of the journal before it was admitted. The inclusion of this evidence was made relevant to rebut defense counsel's use of the same evidence to show Appellant was a good mom. Appellant cannot now complain about the use of the journal. *See Malicoat v. State,* 2000 OK CR 1, ¶ 40, 992 P.2d 383, 403–04.

### B.

¶ 37 In proposition five, Appellant claims that hearsay was improperly admitted under the guise of "co-conspirator hearsay." This claim relates to Pavatt's statement to Janna Larson. Larson was allowed to testify that Pavatt said, "[Y]ou're never going to believe what that nuttier than a fruit cake woman asked me to do. And then he told me that she asked him if he would kill her husband or if he knew someone that could do it. . . ." Defense counsel objected that the statement was hearsay within hearsay, the statement was not corroborated, and there was no evidence of an agreement.

¶ 38 The record indicates that this conversation occurred around the end of October, 2001. About the same time that Pavatt

asked Larson to call Rob Andrew and tell him to drive to Norman, Oklahoma to pickup Appellant, after the brake lines to his vehicle had been cut.

¶ 39 Circumstantially, looking at the totality of the evidence introduced to that point, it could reasonably be concluded that Pavatt had entered into an agreement with Appellant to kill Rob Andrew. The conversation with Larson was meant to get her reaction to the idea. He needed Larson to make a call to get Rob Andrew to drive a long distance with faulty brakes. This conversation furthered the conspiracy by allowing Pavatt to know what tactic to take with Larson in involving her in the scheme. The trial court did not abuse its discretion in allowing this evidence in as non-hearsay under the co-conspirator theory. *See* 12 O.S.Supp.2002, § 2801.

### C.

¶ 40 In proposition three, Appellant claims that the trial court erred by allowing the State to introduce evidence of other crimes and bad acts which were not relevant. The admission of this evidence, as with all evidence, is reviewed under the abuse of that discretion standard spelled out above.

¶ 41 Evidence that a defendant committed other crimes is admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. 12 O.S.2001, § 2404(B); *Lott,* 2004 OK CR 27, ¶ 40, 98 P.3d at 334–35. Proof of "other crimes" must be clear and convincing. *Id.*

¶ 42 The State argues that nearly all of this "other crimes" evidence was *res gestae* evidence, which is evidence that is (a) so closely connected to the charged offense as to form part of the entire transaction, (b) necessary to give the jury a complete understanding of the crime, or (c) central to the chain of events. *See Rogers v. State,* 1995 OK CR 8, ¶ 21, 890 P.2d 959, 971 (and cases cited therein).[6]

---

6. "Giving the jury a complete understanding of the crime" phrase was first utilized by this Court in *Carter v. State,* 1985 OK CR 33, 698 P.2d 22, where the omission of the other crimes evidence

would have left gaps in the testimony and would have likely confused the jury and left them to speculate about what happened during a single episode. *Id.* ¶ 13, at 24–25. This definition

¶ 43 The issue here boils down to whether the complained of evidence was relevant to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or whether the evidence is improper character evidence, which is generally prohibited. *See* 12 O.S.2001, § 2404. Specific instances of conduct to prove a person's character or a trait of character are admissible when the character is part of a claim or defense. 12 O.S.2001, § 2405(B).

■■■ ¶ 44 Initially, Appellant attacks evidence concerning the cutting of the brake lines of Rob Andrew's car. Appellant claims that there was insufficient evidence which tied her to this crime under a clear and convincing standard, not that the evidence was otherwise inadmissible.

¶ 45 Sometime around the end of October, 2001, Appellant asked Pavatt to kill Rob Andrew. About this same time, on October 26, the brake lines to Rob Andrew's vehicle were cut. Pavatt asked his daughter to call Rob and tell him that he needed to come to Norman to pick up Appellant at the hospital; in an obvious attempt to get Rob to drive some distance from his northwest Oklahoma City home with faulty brake lines. Appellant claims that there was insufficient evidence linking her to this incident.

¶ 46 Appellant claims that the only particular piece of evidence linking her to the crime was inadmissible hearsay evidence concerning the fact that Appellant knew about the brake lines being cut before she could have innocently acquired the information. However, the State introduced evidence of an enormous amount of phone calls between Pavatt and Appellant on October 25 and October 26. Appellant attempts to give alternative meaning to phone calls made on October 26 by stating these are the calls during the time Rob Andrew was trying to change the beneficiary to his policy after learning that his brake lines had been cut. However, Appel-

lant does not try to explain the number of phone calls made on October 25 and the morning of October 26.

¶ 47 Other evidence, furthermore, links Appellant to this attempt on Rob Andrew's life. Appellant appeared at the bank where Janna Larson was working in Norman shortly after Larson called Rob Andrew, in an attempt to get him to drive to Norman. During this visit, Appellant asked Larson about phone calls she made to Rob Andrew. This evidence, coupled again with evidence about Brenda's hatred of Rob and her threats, show by clear and convincing evidence a link between Appellant and the attempt on Rob Andrew's life.

¶ 48 Certainly this evidence was relevant to the charged crime of conspiracy to commit first degree murder, which the State alleged started on September 1, 2001. The cutting of the brake lines, though not alleged as an overt act in the conspiracy was relevant to show an agreement existed between Appellant and Pavatt at the time the brake lines were cut. This evidence was also "inextricably intertwined" with the murder offense, thus it was admissible intrinsic evidence. *See United States v. Viefhaus,* 168 F.3d 392, 397–98 (10th Cir.1999).[7] evidence is similar to the *res gestae* exception used by this Court.

■■■ ¶ 49 Next, Appellant complains about evidence that she had extramarital sexual affairs with two other men. Appellant claims that this evidence, although not criminal, was evidence of bad acts, only introduced to show her bad character. This evidence was relevant to show motive.

¶ 50 The first affair, with Rick Nunley, started in 1997 and ended probably about four years prior to this murder; however, Appellant and Nunley kept in contact through phone conversations. Nunley met Appellant in downtown Oklahoma City around the first of October, 2001. Appellant told Nunley about the divorce proceedings.

should be read in conjunction with the other two so that this exception does not swallow the rule.

**7.** Rule 404(b) of the Federal Rules of Evidence does not apply to other act evidence that is intrinsic to the crime charged. "Other act evidence is intrinsic when the evidence of the other act and the evidence of the crime charged are

inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *United States v. Lambert,* 995 F.2d 1006, 1007 (10th Cir.1993), *quoting United States v. Williams,* 900 F.2d 823, 825 (5th Cir.1990).

At some point between then and the murder, Appellant expressed to Nunley that she was upset about Rob trying to change the beneficiary on the life insurance policy. Cell phone records indicated eighty-seven phone calls between Appellant and Nunley during the months of September, October and November, 2001. Appellant also called Nunley from jail when she was arrested, while returning to the United States from Mexico. Evidence of their sexual affair was limited to one question during his testimony. Thus, even though, the evidence of a sexual affair between Nunley and Appellant was remote, its significance was a minimal part of the relationship, and the mention of it was harmless in this case.

¶ 51 The second affair, this with James Higgins, started in 1999 and ended in May 2001, just six months prior to Rob's murder. Evidence of this affair was more detailed. This sexual affair started when Appellant handed Higgins a key to a motel room and they met that afternoon at the motel room. These types of meetings occurred several times a week during those two years. They also had sex at the Andrew home and in the car. All during this time, Appellant kept telling Higgins how much she hated Rob Andrew. She also told Higgins that she wished Rob Andrew was dead.

¶ 52 This Court has allowed evidence of an affair for the purpose of establishing motive. In *Allen v. State*, 1993 OK CR 49, 862 P.2d 487, this Court held that evidence that the defendant had a sexual relationship with his secretary, which ended six months prior to the murder of his wife, was relevant to show motive. *Id.* ¶ 17, at 491. This Court reasoned that evidence of a close personal relationship, where intimate details of the defendant's marriage were shared, was relevant.

¶ 53 This case is no different; Appellant shared with both of these men her hatred for Rob Andrew and her wish that he was dead. Her co-defendant was just the last in a long line of men that she seduced; however, this last man shared the same hatred of Rob and was willing to kill for Appellant. The evidence of Appellant's affairs proved motive and intent in this case. The trial court did not abuse its discretion in admitting this evidence.

¶ 54 Appellant further complains about a litany of evidence under this "other crimes evidence" claim. The complaints cover the following evidence: testimony from Rob Andrew's co-worker, Barbara Murcer–Green, concerning confrontations at the workplace between Appellant and Rob Andrew and Appellant's threats to her personally, which was met with a contemporaneous objection. This evidence was relevant to show Appellant's hatred and rage, and possible resentment toward Rob Andrew, thus it was relevant.

¶ 55 Other evidence included Higgins' testimony that Appellant had "come on to" his two adult sons when they were building a deck for the Andrews; David Ostrowe's testimony that she was dressed provocatively when the Andrews and the Ostrowes went to dinner together (6–8 weeks before the murder), someone in the restaurant called Appellant a "hoochie," and inappropriate talk about a trip to Mexico; Ron Stump's testimony that Appellant changed her hair color after learning what color of hair Ron liked; and David Head's testimony, over objection, about Appellant threatening to kill him.

¶ 56 This Court is struggling to find any relevance to this evidence, other than to show Appellant's character. The State agrees that most of this evidence was irrelevant to any issue in this case; however, even so, the introduction of this evidence was harmless due to the overwhelming evidence in this case.

¶ 57 Additional evidence included William Burleson's testimony about Appellant's demeanor at the funeral home; Cynthia Balding's testimony about Appellant hiding money; testimony regarding Appellant's attempt to influence the children with a puppy; Janna Larson's testimony that she told her father, James Pavatt, that she thought Appellant lied when she told him she had not slept with any other men other than her husband and Pavatt; and testimony that Pavatt told Larson that the Andrew children were well trained and would not tell of the affair between he and Appellant.

¶ 58 First, out of this evidence, the evidence of Appellant's demeanor at the funeral home was relevant to show a consciousness of guilt, and as such is not considered "other crimes" evidence. *See Anderson v. State*, 1999 OK CR 44, ¶ 15, 992 P.2d 409, 416. The witness testified that in all of his long experience, her flat, cold, and unemotional demeanor was the most bizarre demeanor he had ever seen from a grieving spouse.

¶ 59 The remaining evidence was relevant to show the relationship between Appellant and Pavatt and the relationship between Appellant and Rob Andrew, Appellant's ability to lie and influence Pavatt, and her desire to keep their sexual affair a secret from the children and others. The evidence concerning the money was relevant to show motive, and the money provided the source which Appellant was to utilize while on the run in Mexico, thus it was relevant as part of this criminal episode.

¶ 60 This proposition would have even less merit had the trial court instructed on the limited use of "other crimes" evidence. We shall discuss this refusal in our discussion of instructional error below.

### D.

¶ 61 In proposition seven, Appellant raises a series of claims attacking the introduction of certain evidence which she claims was irrelevant or at least more prejudicial than probative. We restate the general rules of evidence here. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." 12 O.S.2001, § 2401. Relevant evidence is admissible unless it is prohibited under the evidence code. One prohibition against admission is that the relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* 12 O.S.Supp.2002, § 2403. Again, introduction is judged under an abuse of discretion standard.

¶ 62 First, Appellant claims, in the first section of this proposition, that evidence was introduced which was used to cast an unwarranted veil of suspicion over Appellant and distract and confuse the jury. This evidence included documents showing that Pavatt made Appellant the primary beneficiary of two life-insurance polices. Appellant claims that there is no evidence that these policies were still valid. Next, Appellant cites to evidence consisting of a tape recording of conversations between Appellant and Rob Andrew recorded in the days before the murder. These recordings include conversations between Tricity and Rob Andrew. Appellant next cites evidence of two Agatha Christie mystery books entitled *Murder is Easy* and *Sparkling Cyanide*. Appellant also complains about the introduction of a title and registration to the Bowlins' vehicle, which was found in the 1992 Chevrolet Beretta Appellant and Pavatt used to drive to Mexico. Appellant claims that this could have been caused by a mix-up in the inventory of both vehicles by the Hidalgo police before the search warrant was served.

¶ 63 All of this evidence was relevant to some aspect of this case. Appellant being named as beneficiary of Pavatt's insurance, whether valid or not, was evidence of the extent of their relationship and provided support for the fact that, at least Pavatt, intended to make their relationship permanent at some point. The tape recordings of the conversations show the way Appellant used Tricity to get Rob Andrew to come over to the house alone. The evidence of the books, considering all of the circumstances, was just one more piece of the puzzle, relevant to show Appellant's role in the children's life to rebut the claim that she was a "good mother." The relevance of these books was slight, but not substantially outweighed by the dangers found in Section 2403.

¶ 64 The relevance of the car ownership papers was relevant to support the State's theory that Pavatt and Appellant intended to switch cars with the Bowlins at some point in order to avoid detection while in the United States (after returning from Mexico). The admissibility was not dependent on the fact that the papers may have never made it into the Beretta while in the possession of Appellant. The Bowlins took these documents

with them so that a vehicle exchange could be made.

■ ¶ 65 Appellant claims the next group of evidence was cumulative of the relationship between Appellant and Pavatt. Relevant evidence may be excluded if the probative value is substantially outweighed by the danger of needless presentation of cumulative evidence. 12 O.S.Supp.2002, § 2403. Appellant complains about a birthday card to Pavatt from Appellant; photographs of Appellant, Pavatt, and the Andrew children taken while on a trip to Six–Flags over Texas; evidence of Pavatt's infatuation with Appellant; and finally the contents of Appellant's luggage, including her thong underwear. All of this evidence was introduced to show the extent and the nature of the relationship between Pavatt and Appellant, and their intentions in fleeing to Mexico—not as a grieving widow, but as a free fugitive living large on a Mexico beach. As this trial was primarily about the motive and intent of Appellant to kill her husband with the aid of Pavatt, this evidence was highly relevant and its probative value was not outweighed by any dangers.

■ ¶ 66 The final group of evidence attacked here includes a letter written by the victim to witness Ron Stump. This evidence, like the hearsay evidence cited above, was relevant to show the victim's state-of-mind and to provide a explanation of the motive. *Welch,* 2000 OK CR 8, ¶ 28, 2 P.3d at 370. Appellant also complains about the introduction of audio tape recordings of phone conversations between herself and the victim. These tapes were relevant to show the type of relationship these two people had, which would cause Appellant to kill her own husband. They were relevant to show her level of hostility, rage and hatred toward her husband, all which provide a motive for the killing. Although she did not kill in a fit of rage, she did use her hatred as a possible "I'll be better off with him dead" self justification for the murder. The relevance of this evidence was not outweighed by any dangers.

¶ 67 Lastly, Appellant urges this Court to consider the hearsay evidence complained of above as an attempt to introduce irrelevant evidence, only for the purpose of eliciting sympathy for the victim. We find that the trial court did not abuse its discretion in allowing the admission of any of the evidence raised in the proposition.

## E.

■ ¶ 68 In proposition eight, Appellant claims that the trial court abused its discretion when it allowed the admission of audio cassette tapes without the proper authentication. "Authentication may be proved by direct or circumstantial evidence, and is sufficient if evidence supports a finding that the matter in question is what its proponent claims it to be." *Hooper v. State,* 1997 OK CR 64, ¶ 29, 947 P.2d 1090, 1102. A voice on a recording may be authenticated if the witness's opinion is based on hearing the voice at any time in circumstances which connect the voice with the alleged speaker. *Id. See* 12 O.S.2001, § 2901.

¶ 69 Craig Box, Rob Andrew's divorce attorney, listened to all of the tapes and testified that the voice on the tapes was that of Appellant. Furthermore, Appellant gives her name, address and policy number over the phone. Appellant also allows Pavatt to converse with the Prudential Insurance office, and she identifies Pavatt as her insurance agent. Pavatt's voice was authenticated by his actions during the call. He gave his company authentication code.

¶ 70 Rob Andrew's voice was identified by Ron Stump on other tapes introduced earlier in the trial. Although Stump did not identify the voice on these particular tapes as those of Rob Andrew, the jury had similarly authenticated tapes from which to determine the voice was that of Rob Andrew.

¶ 71 The audio tapes in this case were sufficiently authenticated and the trial court did not abuse its discretion in allowing these tapes into evidence.

## F.

■ ¶ 72 In proposition nine, Appellant argues that her statements to police were the result of custodial interrogation, thus their introduction was unconstitutional because

she had not been advised of her *Miranda*[8] rights. During the *Jackson v. Denno*[9] hearing, Appellant admitted that she agreed to speak with the police because she wanted to help the police catch those responsible for shooting her husband. Appellant was taken to the police station to be questioned by detectives. The detective interviewing her considered her to be a witness, not a suspect. She was taken to a friend's house after the interview. She was not "arrested" at any time. She was not handcuffed, shackled or placed in any type of restraint. Eye-witnesses are routinely taken to the police station for interviews. Appellant was the only living eye-witness to this crime. Under the circumstances of this case, a reasonable person in the same position would not conclude that he or she was in custody. *See Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984) (the relevant inquiry is how a reasonable man under the circumstances would understand the situation.) Warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). The trial court did not abuse its discretion in allowing the admission of Appellant's statements.

### G.

¶ 73 Next, in proposition four, Appellant claims that the trial was infected with improper and inadmissible opinion testimony. The admissibility of lay witness' opinions is a determination within the sound discretion of the trial court whose decision will not be disturbed unless clearly erroneous or a clear result of an abuse of discretion. *Washington v. State*, 1999 OK CR 22, ¶ 21, 989 P.2d 960, 970. Opinion testimony of a lay witness is permissible under 12 O.S.2001, § 2701 when it is rationally based on the perception of the witness and is helpful to the determination of a fact in issue.

¶ 74 Appellant first claims that witnesses were improperly allowed to give

their opinions of her guilt. The determination of guilt or innocence is the sole and exclusive province of the jury, and a witness may not express an opinion on this issue. *Bowie v. State*, 1991 OK CR 78, ¶ 3, 816 P.2d 1143, 1145.

¶ 75 Ron Stump and Rod Lott both gave testimony indicating that they believed that Appellant was responsible for killing Rob Andrew. Officer Mike Klinka, Michael Fetters and Mark Sinor testified that Rob Andrew relayed to them that he believed that Appellant was trying to kill him.

¶ 76 The questioning of Rod Lott came during re-direct after defense counsel was allowed to ask if Rod Lott liked Appellant, and defense counsel's questioning of Lott's motivation for testifying. The prosecutor asked why he did not like her. Rod Lott answered, "I believe she's responsible for his death." This testimony was properly admitted because Appellant opened the door on cross-examination, so that the prosecution could delve into Lott's motivation.

¶ 77 Stump's initial opinion, that Appellant and Pavatt killed Rob Andrew, and his testimony that he knew of no one that had a motive to kill Rob Andrew other than Appellant and Pavatt was not met with an objection. We review for plain error here, and we find none.

¶ 78 Mike Klinka's, Michael Fetters' and Mark Sinor's testimony was admitted to show Rob Andrew's state-of-mind as explained above. There is no reason to rehash this argument here.

¶ 79 Next, Appellant claims that other witnesses were allowed to give "expert" opinion evidence without being qualified to do so. An expert witness is one who possesses scientific or specialized knowledge acquired by study or practice or by both, and is, ordinarily, a person who has experience and knowledge in relation to matters which are not generally known. *Kennedy v. State*, 1982 OK CR 11, ¶ 27, 640 P.2d 971, 977.

8. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

9. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

¶ 80 The witnesses Appellant complains about here are police officers. Police officers are allowed to give opinion testimony based on their training and experience. *Berry v. State*, 1988 OK CR 83, ¶ 6, 753 P.2d 926, 929–30; *McCoy v. State*, 1985 OK CR 49, ¶ 14, 699 P.2d 663, 665–66.

¶ 81 Sgt. Frost testified that it was "very strange" that Appellant could not remember the words spoken by her alleged attackers. He also testified that she was unusually calm and he felt it unusual that she did not ask about her husband while at the hospital. Technical Investigator Teresa Bunn testified similarly. We find that the trial court did not abuse its discretion in allowing this testimony as it was properly based on their perceptions in conjunction with their training and experience.

¶ 82 Frost was also allowed to testify that it was significant that Appellant was shot at close range, without explanation. Any error in relation to this testimony was harmless due to the overwhelming evidence that she was indeed shot at close range. Officer Klinka was allowed to testify that he believed that Appellant was involved in the cutting of Rob Andrew's brake lines. Appellant failed to object to this testimony, thus we review for plain error only. We find that this testimony does not rise to the level of plain error based on the context of the testimony as rebuttal to defense counsel's cross-examination regarding a link between Appellant and the brake line incident.

¶ 83 Appellant claims that Detective Garrett was allowed to testify that he believed that Pavatt was preparing to move into the Andrew home. The questioning regarded what Pavatt was doing the day of the murder. Garrett testified that Pavatt was moving his washer and dryer into the Andrew home. The prosecutor asked, "Moving in?" Garrett answered "Yes." An objection to this testimony was sustained, but the trial court did not admonish the jury as requested. Defense counsel objected that the answer was speculation and the trial court announced that it was speculation, but the trial court denied counsel's request to have the jury admonished. We find that the trial court's actions cured this error as an admonishment would have merely magnified the possibility of prejudice. *See Ferguson v. State*, 1984 OK CR 32, ¶ 10, 675 P.2d 1023, 1027.

### H.

¶ 84 In proposition one, Appellant complains that she was prohibited from calling or presenting testimony from witnesses essential to her defense, due to the trial court's erroneous rulings. Some of this testimony was excluded because the trial court found that trial counsel failed to comply with the discovery code. *See* 22 O.S.Supp.2002, § 2002. The exclusion of this testimony as a sanction to a discovery code violation is reviewed under an abuse of discretion standard. *Rojem v. State*, 2006 OK CR 7, ¶ 46, 130 P.3d 287, 297.

¶ 85 The right to call witnesses to present a defense is a fundamental element of due process. *Id.* at ¶ 47 130 P.3d at 297, *quoting White v. State*, 1998 OK CR 69, ¶ 12, 973 P.2d 306, 311. The exclusion of evidence might be the appropriate sanction for a discovery code violation in the most severe cases, where the violation is "willful and motivated by a desire to obtain a tactical advantage." *Id.* Alternative sanctions are appropriate in other cases. *Id.*

¶ 86 First, Appellant claims that she was not allowed to present the testimony from Sergeant Larry Northcutt and Officer Roger Frost, both of whom worked during their off duty hours patrolling the Lansbrook neighborhood where the Andrews lived. Counsel asked Northcutt whether Appellant requested extra patrols around her house. Trial court ruled that the information had not been provided in discovery; therefore, Northcutt could not answer the question. Not until the day that Northcutt was to testify, did Appellant provide a summary of his testimony. No good reason existed for this other than to attempt to gain a tactical advantage; therefore, the trial court did not abuse its discretion in precluding this testimony.

¶ 87 Counsel asked Frost, in many different ways, whether Northcutt told him

that Appellant requested extra patrols at her residence. The trial court sustained each objection based on hearsay. What was evident from the testimony was that the off-duty officers were providing extra patrol near the residence. On appeal, Appellant argues that the testimony is not hearsay, it is provided to show why the officers provided extra patrol. On the contrary, counsel wanted to elicit this testimony to show that Appellant requested extra patrols in order to show that she was not a calculating murderer. This testimony was hearsay and the trial court did not abuse its discretion.

¶ 88 Furthermore, the jury was well aware that extra patrols were requested. The only information that was kept from the jury was that Appellant had requested those patrols. The failure to give this information to the jury did not prejudice Appellant. The jury might have believed that her request for extra patrols took place during the planning stage of this murder, and the request was just another method of deflecting suspicion away from her.

¶ 89 Next, Appellant cites to her attempts to present the testimony of Lisa Gisler and Carol Shadid, who were neighbors of Appellant, regarding what they heard on the night of the murder. These witnesses heard noises, which Appellant describes as a "loud noise" (Gisler) or "three shotgun blasts" and a scream (Shadid). Appellant claims this testimony would corroborate her story of the events and rebut the staging theory espoused by the State.

¶ 90 Defense counsel provided the State with a list of witnesses which included these two witnesses; however, no summary of their expected testimony was provided. Nevertheless, both of these witnesses provided statements to the police. Their statements were contained in police reports that were in the custody of the State. Defense counsel made an offer of proof indicating that their testimony would be consistent with their statements to police. Preclusion of this testimony, under the circumstances was too harsh a sanction, thus there was an abuse of discretion here. The trial court had at its disposal the possibility of a short continuance, if necessary, so the State could prepare for cross-

examination of these two witnesses, especially considering the limited nature of their testimony. The trial court abused its discretion in using the preclusion sanction.

¶ 91 Even though an abuse of discretion occurred, we find that the error was harmless beyond a reasonable doubt. *See Hooks v. State,* 2001 OK CR 1, ¶ 14, 19 P.3d 294, 307. Despite Appellant's claim, evidence that there were three shots is consistent with the State's theory of two shots fired from a shotgun and one fired from a .22 caliber handgun. The testimony is inconsistent with Appellant's story that she heard only two shots fired. Furthermore, both reconstruction experts, prosecution and defense, testified that Appellant's gunshot wound was evidence of a staged event.

¶ 92 Next, Appellant claims that exclusion of Officer Ronald Warren's testimony was error. The testimony was excluded, because of a lack of pre-trial notice. This officer made a written report, which was in the custody of the State. The report spells out his expected testimony. Like the above witnesses, the exclusion of the testimony constituted an abuse of discretion. However, defense counsel was able, through another witness, to elicit the same evidence; evidence that Appellant was kneeling over obviously deceased Rob Andrew attempting to aid him, while disregarding her own gunshot injury. This excluded evidence was largely cumulative; therefore, the exclusion was harmless beyond a reasonable doubt.

¶ 93 Lastly, Appellant claims that the exclusion of testimony from Donna Tyra was error. Donna Tyra was a detention officer at the County jail. Defense counsel listed Tyra as a second stage witness who would offer testimony about Appellant's good character while incarcerated at the County jail (the State did not list Tyra as a witness or have a report from her, unlike the above witnesses) However, defense counsel wished her to testify to rebut witness Teresa Sullivan's testimony regarding Appellant's confession.

¶ 94 An offer of proof indicated that Tyra would have testified that Sullivan was a

known snitch, known as the "mouth of the south;" Sullivan and Appellant could not have contacted each other, either verbally or through notes; and that there were newspapers available to the inmates on the pod, so that Sullivan could have learned the facts of the case through news reports. Discovery of this testimony was not presented to the State.

¶ 95 Defense counsel was allowed to produce the testimony of Angela Burk, who testified that Sullivan was a known snitch. She testified that she communicated to Sullivan through the cell doors, and she testified that inmates were sometimes out in the pod together. Any error in the failure to allow Tyra to testify was harmless beyond a reasonable doubt.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

¶ 96 In proposition six, Appellant claims that she was denied effective assistance of counsel. In order to show that counsel was ineffective, Appellant must show both deficient performance and prejudice. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).[10] In *Strickland,* the Court went on to say that there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional conduct, i.e., an appellant must overcome the presumption that, under the circumstances, counsel's conduct constituted sound trial strategy. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

¶ 97 To establish prejudice, Appellant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

¶ 98 In the context of a capital sentencing proceeding, the relevant inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069.

¶ 99 Appellant first claims that counsel was ineffective for failing to provide adequate witness summaries, for which reason defense witnesses were prohibited from testifying (see proposition one). In our discussion of proposition one, we held that, where error occurred in the prohibition of this testimony, the error was harmless beyond a reasonable doubt. We further find that defense counsel's failure to provide adequate witness summaries did not prejudice Appellant, thus the second prong of *Strickland* is not satisfied. Counsel cannot be defined as ineffective.

¶ 100 Appellant next claims that counsel was ineffective for failing to make contemporaneous objections to damaging hearsay statements and improper opinion evidence (see propositions two and four). We addressed the substantive portion of these arguments above and found that the majority of the evidence was properly admitted. We further find that counsel was not ineffective for failing to object to this evidence, as there was no resulting prejudice.

¶ 101 Appellant next claims that counsel was ineffective for failing to investigate and present evidence tending to show her innocence which is divided into three categories; (1) blood pattern evidence, (2) signature evidence, and (3) corroborating witnesses.[11]

¶ 102 The blood pattern evidence deals with the defense expert who testified that Appellant had high velocity blood spatter on her jeans. In closing the prosecution turned this evidence against Appellant by arguing that she received this spatter by firing the second shot and getting blow back blood spatter from Rob. However, this

---

10. The Strickland standard continues to be the correct test for examining claims of ineffective assistance of counsel where counsel fails to utilize mitigation evidence. *Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

11. Appellant has filed a motion for an evidentiary hearing based on this evidence pursuant to Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2007).

blood spatter had never been tested to determine its source. Now, during the pendency of this Appeal, Appellant provides DNA analysis which she argues shows that the blood stains were from her alone. The State's response points out that the blood is a mixture: the major component from Appellant and the minor component being from an unknown male (arguably the victim because the tester cannot exclude the victim as the source of the blood). Appellant claims that utilizing a defense expert without first determining the source of these stains led to the theory that she fired the second shot, making her more culpable and allowing the jury to more easily give her the death penalty. The prosecutor could have made this argument by stating that the unknown (minor component) blood spatter came from the victim, forming the basis for the same argument.

¶ 103 This evidence does not show by clear and convincing evidence that the outcome would have been different; consequently, no evidentiary hearing is necessary.

¶ 104 Next, Appellant claims that new evidence regarding the signatures on a change of ownership application (State's exhibit 24) for the $800,000.00 life insurance police shows that she did not forge the signature of Rob Andrew, but that Pavatt could have copied the signatures from other documents and pasted them to this document; a "cut and paste" theory of forgery.

¶ 105 Appellant had retained an expert in this area for trial, Ernie Smith. He told counsel of his "cut and paste" theory regarding Robert D. Andrew's signature. He was not called to testify. This was a sound strategic decision, based on the evidence.

¶ 106 Appellant maintained that the change of ownership document was genuine in conversations with the judge handling the divorce, a close friend, and the Prudential Insurance Agency. Appellant and Pavatt were working together to find some way that Appellant would receive the proceeds of the life insurance policy. No clear and convincing evidence exists for the holding of an evidentiary hearing, because in any event the documents were forged by Appellant and Pavatt working together.

¶ 107 Lastly, Appellant claims that additional witnesses exist who could have corroborated Appellant's story, could have bolstered Pavatt's confessional letter, and could have rebutted some of the State evidence.

¶ 108 Appellant provides, in the application for evidentiary hearing, an affidavit from a neighbor who would have testified that she heard two shots, she heard screaming, and she saw someone bending over in the front yard after the shots. Appellant claims that this bolsters her story that the final two shots were simultaneous, sounding like one shot, and the story that there were two assailants as the person this neighbor saw outside could have been the second assailant. This witness testified at Pavatt's trial but did not testify at the present trial.

¶ 109 Another witness regards the letter from Pavatt, introduced at trial, wherein he stated that he and another assailant were responsible, and Appellant was not involved. He stated that he shot Appellant and the other assailant shot Rob Andrew. To this day, Pavatt has not named the second assailant. Appellant now provides an affidavit from Appellant's brother-in-law, James Bowlin, who states that Pavatt told him the same story when he met them in Mexico, just days prior to their arrest.

¶ 110 The last witness, not utilized at trial, was Appellant's sister, Kimberly Bowlin who states that it was her, not Appellant, who was present near the target practice area just days prior to the murder.

¶ 111 Appellant's application for evidentiary hearing shall be denied. She has not presented clear and convincing proof to this Court that counsel was ineffective for failing to present this evidence, thus entitling her to an evidentiary hearing on this extra-record evidence and to have the record supplemented with the evidence. *See* Rule 3.11 ("the application and affidavits must contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective.")

## V. FIRST STAGE INSTRUCTIONAL ERROR

¶ 112 In proposition eleven, Appellant claims that the trial court erred in its in-

structions to the jury. It is well settled that trial courts have a duty to instruct the jury on the salient features of the law raised by the evidence. *Hogan v. State*, 2006 OK CR 19, ¶ 39, 139 P.3d 907, 923. Even if a trial court fails in this duty, this Court will not reverse on instructional error unless the error resulted in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right. 20 O.S.2001, § 3001; *Carter v. State*, 2006 OK CR 42, ¶ 5, 147 P.3d 243, 244, *citing Ashinsky v. State*, 1989 OK CR 59, ¶ 20, 780 P.2d 201, 207.

¶ 113 First, Appellant claims that the trial court erred in failing to give cautionary instructions on jailhouse informant testimony.[12] The instruction was requested in response to witness Teresa Sullivan's testimony. Sullivan testified that Appellant confessed that she and Pavatt killed Rob Andrew for the money, house, kids and each other. Sullivan was an inmate in the Oklahoma County Jail when Appellant confided in her.

¶ 114 This instruction is to be given when a witness is a "professional jailhouse informant." *Wright v. State*, 2001 OK CR 19, ¶ 21, 30 P.3d 1148, 1152. Sullivan was in federal custody while at the county jail. She was not facing any State charges, and she testified that she did not expect any benefit from testifying. She did not seek out authorities with which to share her story. She, as well as others incarcerated in the county jail with Appellant, were contacted to determine whether they had information relevant to this case. The possibility that Sullivan was a jailhouse informant was not supported by the evidence presented to the trial court. The trial court did not err in failing to give this instruction.[13]

¶ 115 Next, Appellant claims that the trial court erred in instructing the jury on the doctrine of flight. Along with this claim, Appellant urges this Court to eliminate and discontinue the jury instructions on the doctrine of flight as it relates to consciousness of guilt. Appellant explained to Sullivan that she left for Mexico to get the kids away from everything, for a little vacation. Her statement explaining her act of departure warranted the giving of the flight instructions. *See Mitchell v. State*, 1993 OK CR 56, ¶¶ 7–8, 876 P.2d 682, 684. Appellant's argument against the doctrine of flight does not persuade this Court to change its position on this issue. The trial court did not err in giving this instruction.

¶ 116 Appellant next claims that the trial court failed in its duty to instruct on the lesser related offense of accessory after the fact. Instructions on this offense were not requested during trial. There was no evidence that Appellant was an accessory after the fact. Her defense was that she did not know who killed her husband. She did not claim that she knew Pavatt killed her husband, so she helped him flee to Mexico to avoid capture, which might be a basis for the instruction. Furthermore, the State's evidence did not support an instruction on this offense. Therefore, the trial court did not err in failing to give this instruction *sua sponte*.[14]

---

12. The relevant instruction, Oklahoma Uniform Jury Instruction Number 9–43A reads:

    The testimony of an informer who provides evidence against a defendant must be examined and weighed by you with greater care than the testimony of an ordinary witness. Whether the informer's testimony has been affected by interest or prejudice against the defendant is for you to determine. In making that determination, you should consider:

    (1) whether the witness has received anything (including pay, immunity from prosecution, leniency in prosecution, personal advantage, or vindication) in exchange for testimony;

    (2) any other case in which the informant testified or offered statements against an individual but was not called, and whether the statements were admitted in the case, and whether the informant received any deal, promise, inducement, or benefit in exchange for that testimony or statement;

    (3) whether the informant has ever changed his or her testimony;

    (4) the criminal history of the informant; and

    (5) any other evidence relevant to the informer's credibility.

13. Andrew has filed a motion for a new trial related to witness Sullivan's potential bias.

14. As recently as 1998, this Court has held that being an accessory to a felony is not a lesser included offense to the defined felony. *Cummings v. State*, 1998 OK CR 45, ¶ 40, 968 P.2d

¶ 117 Appellant next complains about the trial court's refusal to give limiting instructions on the use of "other crimes" evidence (see discussion above regarding the evidence). We find that jury instructions on the use of other crimes evidence was warranted in this case, although some of the evidence indicating that Appellant committed other crimes or "bad acts" was part of the *"res gestae,"* much of the evidence was presented as "other crimes" evidence for the specific purposes spelled out in 12 O.S.Supp. 2002, § 2404. However, in spite of this error, we find that the error to give the requested instruction did not create the type of injury which requires reversal of this case. *See* 20 O.S.2001, § 3001.1; *also see Anderson v. State,* 1999 OK CR 44, ¶ 16, 992 P.2d 409, 416–17.

## VI. SECOND STAGE ISSUES

¶ 118 In proposition fourteen, Appellant claims there was insufficient evidence to support the especially heinous, atrocious, or cruel aggravating circumstance. When the sufficiency of the evidence supporting an aggravator is challenged on appeal, we review the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the facts necessary to support the aggravating circumstance beyond a reasonable doubt. *DeRosa,* 2004 OK CR 19, ¶ 85, 89 P.3d at 1153. This Court upholds a jury's finding of this aggravating circumstance when it is supported by proof of conscious, serious physical abuse or torture prior to death. *Davis v. State,* 2004 OK CR 36, ¶ 39, 103 P.3d 70, 81.

¶ 119 Appellant, in her phone call to police told the emergency operator, during her second 911 call, that her husband was breathing, conscious and was trying to talk, even after being shot twice. This conversation occurred at around five minutes after Rob Andrew was shot. The medical examin-

er testified that Rob was shot twice. The medical examiner also testified that death would not have been instantaneous.

¶ 120 Although the murder weapon was never found, circumstantial evidence showed that Rob was shot with a single-shot shotgun, which would have required manual reloading between the shots. The evidence supported the fact that Rob was conscious during this time and even after being shot the second time. When emergency personnel arrived, Andrew was still clutching a trash bag full of empty aluminum cans, which reasonably suggested that he either tried to shield himself from being shot, or attempted to ward off his attacker. All of these facts tend to show that Rob Andrew suffered serious physical abuse, and was conscious of the fatal attack for several minutes. *See Ledbetter v. State,* 1997 OK CR 5, ¶¶ 53–54, 933 P.2d 880, 896 (evidence that murder victim was likely aware that she was about to be assaulted because defendant had attempted to kill her one week earlier, that she tried to defend herself from the fatal attack, and that she attempted to communicate with a neighbor after the attack was sufficient to show that the murder was especially heinous, atrocious or cruel).

¶ 121 Appellant claims, in proposition twelve, that the trial court failed to properly instruct the jury during the second stage proceedings, thus depriving her of her right to fair sentencing proceeding. She first claims that the trial court failed to instruct on the necessary elements of murder for remuneration. This argument rests on the trial court's failure to give Appellant's requested instruction on the aggravating circumstance of murder for remuneration.

¶ 122 The trial court gave the uniform instructions on the murder for remuneration aggravating circumstance. The uniform instruction only states that "the person committed the murder for remuneration or the

---

821, 834. However, this Court's decision in *Shrum v. State,* 1999 OK CR 41, 991 P.2d 1032, wherein this Court allowed instruction on all lesser "related" offenses allowed this Court to reverse cases where evidence of the greater offense was lacking and there was some evidence of a lesser "related" offense. *See Glossip v. State,* 2001 OK CR 21, 29 P.3d 597.

A discussion regarding an all or nothing approach to a defense is not appropriate here—suffice it say that the State should be confident in their charging so that an accessory offense is not the "fall back" position.

promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration." OUJI–CR 4–72 (2000). No further defining instructions are included in the uniform instructions.

¶ 123 Appellant requested that the jury be instructed as follows:

The State has alleged that the defendant committed the murder for remuneration or the promise of remuneration. This aggravating circumstance is not established unless the State proves beyond a reasonable doubt that:

First: the murder was committed by the defendant for the purpose of her financial gain.

Second: the defendant was in a position to receive financial gain by the act of murder at the time the homicide occurred.

¶ 124 We initially note that this requested instruction does not fully describe or define the murder for remuneration aggravating circumstance, thus it does not accurately state the law. This Court has determined that the murder for remuneration instructions accurately state the law.

¶ 125 The traditional application of the "murder for remuneration" aggravating circumstance has been where a defendant has been hired or has hired another person to perform an act of murder. *Plantz v. State*, 1994 OK CR 33, ¶ 42, 876 P.2d 268, 281. Murder for remuneration has also been applied to killings motivated primarily to obtain proceeds from an insurance policy. *Id.* We find that the trial court did not abuse its discretion in refusing Appellant's proposed instruction.

¶ 126 Appellant next claims that the trial court's answer to the jury's question about life without parole was inadequate. During second stage deliberations, the jury sent out a note asking, "Is [sic] life without parole mean incarceration in prison until her natural death?" The trial court answered that life without parole was self-explanatory. Trial counsel did not object to this answer, thus we review for plain error. This type of answer was one of the options recommended in *Littlejohn v. State*, 2004 OK CR 6, ¶ 11, 85

P.3d 287, 293–94, therefore, there is no plain error here.

¶ 127 Next, Appellant claims that the uniform instructions on mitigating circumstances, OUJI–CR 2d 4–78, ran afoul of *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978), as the prosecutor was allowed to use the language to fashion an argument which compared mitigation with culpability. The same argument made here was rejected in *Hogan v. State*, 2006 OK CR 19, ¶ 94, 139 P.3d 907, 936. We find no reason to revisit this issue, especially in light of the fact that the jury was instructed that they could decide what mitigating factors existed beyond those listed pursuant to OUJI–CR 4–79, and consider them as well. *See also Rojem v. State*, 2006 OK CR 7, ¶¶ 57–58, 130 P.3d 287, 299. Appellant's arguments regarding the second stage instructions must fail.

## VII. PROSECUTORIAL MISCONDUCT

¶ 128 In proposition thirteen, Appellant alleges several instances of what she calls prosecutorial misconduct. We first note that no trial will be reversed on the allegations of prosecutorial misconduct unless the cumulative effect was such to deprive Appellant of a fair trial. *Garrison v. State*, 2004 OK CR 35, ¶ 128, 103 P.3d 590, 612. Many of the allegations here were not preserved at trial with contemporaneous objections, thus we review for plain error. We will not find plain error unless the error is plain on the record and the error goes to the foundation of the case, or takes from a defendant a right essential to his defense. *Simpson*, 1994 OK CR 40, ¶ 23, 876 P.2d at 698.

¶ 129 Appellant first claims that the prosecutor intentionally misled the jury by pointing out to them that Tricity Andrew did not beg for her mother's life. Defense counsel had planned and had informed the Court that he intended to ask Tricity if she wanted her mother to get the death penalty, but the question was never asked, possibly due to Tricity's emotional state on the witness stand. Appellant also claims that the prosecution attacked defense counsel's choice to use Appellant's fifteen-year-old niece to ask

to spare Appellant's life by asking the jury, "would you put your 15–year–old niece on the stand to do that? I wouldn't." There was no objection to either of these comments.

¶ 130 While these comments were "low blows" and may have constituted improper argument and casting aspersions on defense counsel, we can confidently say that they did not rise to the level of plain error.

■ ¶ 131 Appellant next claims that the prosecutor improperly attacked her by stating in response to mitigating evidence indicating she was a good mother, "Would she bring men into her house with her children there and her husband at work?" This comment was not met with an objection. The comment was properly based on the evidence, and it was in response to the list of mitigating evidence, thus did not constitute error. *See Selsor v. State*, 2000 OK CR 9, ¶ 35, 2 P.3d 344, 354.

■ ¶ 132 Appellant, next points us to the prosecutors comment that, "Rob Andrew's parents would like to visit him in prison. . . . The only place they get to visit is his grave." The prosecutor used this comment to rebut mitigating evidence that Appellant "has many relatives who would visit her in prison if given the opportunity." Again, no objection was lodged. This comment is similar to the ones condemned in *Duckett v. State*, 1995 OK CR 61, ¶ 46, 919 P.2d 7, 19.[15] However, as in *Duckett*, we find that the comment did not rise to the level of plain error.

■ ¶ 133 Appellant next claims that the prosecutor attempted to elicit sympathy for the victim by pointing out that Appellant murdered a man with admirable attributes, noting specific aspects of his life. Again, there was no objection. This argument did not rise to the level of plain error.

■ ¶ 134 Next, Appellant complains that the prosecutor, during second closing, attacked defense counsel's argument. The prosecutor pointed out that defense counsel argued that Rob would ask for forgiveness

just as Jesus did on the cross, then later told them that Appellant was "a cold-blooded, heartless killer." These comments were separated by nearly fourteen pages of transcript and were in direct response to defense counsel's argument. There was no error here. *See DeRosa*, 2004 OK CR 19, ¶ 70, 89 P.3d at 1149.

■ ¶ 135 Next, Appellant claims the prosecutor argued facts not in evidence by trying to get the jury to imagine what Rob's last word were, "Was it goodbye, I love you, Brenda? Was it I forgive you? Was it, take care of my children?" No objection to these comments was lodged. This was also, arguably, in response to defense counsel's argument regarding Rob's belief in forgiveness and argument regarding the aggravating circumstance of heinous, atrocious or cruel. No plain error occurred here.

¶ 136 Appellant claims that the prosecutor's argument that Rob's mother could not make it to the witness stand was arguing facts not in evidence. Defense Counsel objected, and the trial court interrupted the argument, allowed the prosecutor to rephrase, then, just a few lines later, after an objection to other comments, reminded the jury, in no uncertain terms, that "nothing that the attorneys say is evidence." We find that any error in these comments was cured, due to the later instruction by the court.

■ ¶ 137 Appellant claims that the prosecutor misstated the evidence by inferring that the victim impact witnesses wanted the death penalty through their testimony, even though Rob's father testified that "all of our family will do everything in our power to assist for convictions and punishment for all of those who are involved in this and responsible for the murder of my son and that they will never ever walk free again." These arguments were in direct response to the defense argument that the victim impact witnesses didn't ask for the death penalty. The prosecutor informed the jury that, by law, the victim impact witnesses could not ask for a specific punishment during their victim im-

---

**15.** The oft condemned argument that the defendant gets three hots and cot, while the victim lays cold in the grave.

pact testimony. There was no objection and the comments do not rise to the level of plain error.

¶ 138 Appellant claims that the prosecutor argued that she deserved the death penalty for things that are not "aggravating circumstances." Appellant points out that the prosecutor argued that "she killed [Rob] because she wanted the money; she wanted the custody of the children." The prosecutor also argued that she deserved the death penalty for the way she treated Rob after "[h]e had forgiven her time and time again." There was no objection here. Remember that one of the aggravating circumstances alleged was continuing threat—this argument was to establish that her motive and callousness caused her to be a continuing threat. There is no error here.

¶ 139 Appellant has failed to show either that her trial was so infected by misconduct as to violate due process, or that her death sentence was improperly or unconstitutionally obtained. *DeRosa*, 2004 OK CR 19, ¶ 70, 89 P.3d at 1149. Appellant was convicted and sentenced to death based upon the facts and circumstances of this case, rather than any improper remarks by the prosecutor. *Id.*

## VIII. NEW TRIAL

¶ 140 Appellant filed a motion for new trial with this Court on September 21, 2005. Appellant's motion is brought pursuant to 22 O.S.2001, §§ 952 and 953, alleging newly discovered evidence. The State filed a response on June 21, 2006.

> The test for whether a motion for a new trial should be granted based upon newly discovered evidence is: (1) whether the evidence is material; (2) whether the evidence could not have been discovered before trial with reasonable diligence; (3) whether the evidence is cumulative; and (4) whether the evidence creates a reasonable probability that, had it been introduced at trial, it would have changed the outcome.

16. The motion is supported by affidavits and documents obtained from the Clerk of the Federal Court for the Western District of Oklahoma.

*Ellis v. State*, 1992 OK CR 45, ¶ 50, 867 P.2d 1289, 1303.

¶ 141 The motion contains information that Teresa Sullivan, who testified against Appellant, received a reduction of her federal sentence due to her cooperation with the Oklahoma County District Attorney's office in this case. Sullivan testified that she had twenty-two (22) months left on her sentence; however, a new sentence was given by the federal court after she testified, which basically allowed her release just five (5) months after testifying. The documents indicate that Sullivan was granted the early release because of her cooperation in this case.

¶ 142 Information attached to the motion also indicates that Sullivan received a downward departure on her federal sentence because she cooperated with the federal authorities in the investigation of her co-defendants (even though she testified that she was not a snitch). The gist of the motion is that the State knew about the potential for a benefit to Sullivan, but failed to disclose the information.[16]

¶ 143 Sullivan testified that Appellant confessed that she and James Pavatt killed Rob Andrew. Sullivan's attorney says in a letter written to the federal prosecutor that he had to explain to her that she might receive additional consideration on her federal sentence if she were called to testify against Appellant. It appears that Sullivan provided information to the State (before testifying) with no understanding that she might receive a benefit. When she testified at trial, there were no guarantees that she would receive any benefit.

¶ 144 One document in particular states that Oklahoma City Police detectives contacted Sullivan at her place of federal confinement as part of their investigation (as well as others who where incarcerated with Appellant at the Oklahoma County Jail). Sullivan provided information to the detectives before contacting, William P. Earley, the federal public defender who represented her in her federal case. The documents indicate that Earley filed the motion for a reduction of

The affidavit states that these documents were obtained on July 26, 2005.

sentence after Sullivan testified as any effective advocate might have done. He stated that he would have filed this motion regardless of any input from the Oklahoma County District Attorney's office.

¶ 145 Appellant has not presented a sufficient showing to be granted a new trial. Substantial additional evidence supports the conviction. We are further convinced that, were we to grant a new trial with this "newly discovered evidence" being introduced, the outcome of the trial would be the same.

¶ 146 Sullivan was thoroughly cross-examined regarding her motivation to testify against Appellant, with repeated attempts to show her bias. Defense counsel also called a witness to refute the possibility that Appellant shared any information with Sullivan. The knowledge of the fact that Sullivan was the beneficiary of an act of grace by the federal courts would not change the outcome of this trial.

## IX. CUMULATIVE ERROR

¶ 147 In proposition fifteen, Appellant urges this Court to view the alleged errors in a cumulative fashion, should we hold that no individual error rises to the level of reversible error. We have reviewed the case to determine the effect, if any, of Appellant's alleged accumulation of error. We find, even viewed in a cumulative fashion, the errors we identified do not require relief. *Stouffer v. State*, 2006 OK CR 46, ¶ 205–06, 147 P.3d 245, 280.

¶ 148 We found error, although harmless, in the admission of some State's evidence and exclusion of some defense evidence. We also found error in the failure to include an instruction on "other crimes" evidence. We find that even viewed in a cumulative fashion, these errors do not require relief. Furthermore, these errors combined with alleged and unpreserved error which did not rise to the level of plain error did not cause Appellant to receive an unfair trial.

## X. MANDATORY SENTENCE REVIEW

¶ 149 We found above that there was sufficient evidence to support the finding of the statutory aggravating circumstance of hei-

nous, atrocious or cruel. We further find that sufficient evidence exists to support the finding of the statutory aggravating circumstance of murder for remuneration. We again note that the jury did not find the aggravating circumstance that there exists a possibility that Appellant will commit criminal acts of violence that would constitute a continuing threat to society. After reviewing the entire record in this case, we find that the sentence of death was not imposed because of any arbitrary factor, passion, or prejudice. Appellant presented mitigating evidence, which was summarized and listed in an instruction to the jury, as follows:

> The defendant did not have any history of prior criminal activity,
>
> The defendant has never committed acts of violence in the past,
>
> The defendant is a good mother, who loves her children very much,
>
> The death penalty would deprive Tricity and Parker Andrew of their only living parent,
>
> The defendant has a family, who loves her and values her life,
>
> The defendant has many relatives, who would visit her in prison if given the opportunity,
>
> The defendant was a kind and giving neighbor and friend,
>
> The defendant has an education and might be able to help other inmates,
>
> The defendant was a dedicated employee, who worked hard,
>
> The defendant has been a model inmate since being incarcerated at the Oklahoma County Jail,
>
> The defendant has always been active in school and church activities.

¶ 150 In addition, the trial court instructed, that the jury could decide that other mitigating circumstances exist and they could consider them as well.

¶ 151 We can honestly say that the jury's verdict was not born under the influence of passion, prejudice or any other arbitrary factor, and the evidence supported the jury's findings of the aggravating circumstances. *See* 21 O.S.2001, § 701.13. Appellant's convic-

tions and her sentences should be affirmed. We find no error warranting reversal of Appellant's conviction or sentence of death for first-degree murder, nor do we find any error requiring the reversal of her conviction and sentence for the crime of conspiracy to commit murder; therefore, the Judgment and Sentence of the trial court is, hereby, **AFFIRMED.**

C. JOHNSON, V.P.J.: concurs.

LUMPKIN, P.J.: concur in results.

A. JOHNSON, J.: concurs in results in part/dissents in part.

CHAPEL, J.: dissents.

LUMPKIN, P.J.: concur in result.

¶ 1 I agree with the outcome reached in this case, which affirms Appellant's first-degree murder and conspiracy convictions and the sentences set by the jury and then ordered by the trial judge. This is an unusually strong evidentiary case, which leaves little or no doubt that Appellant is guilty of the crimes charged, crimes committed after methodical planning.

¶ 2 At times cases come before us where we are challenged to ascertain who is actually responsible for the crime at issue: this is not one of those cases.

¶ 3 Guilty or not, Appellant deserves a fair trial, one that is reliable and that is free of the sorts of errors or accumulations of error that would leave this Court with grave doubts about the outcome.

¶ 4 Therefore, while I agree that the propositions raised by Appellant do not merit any relief, I believe today's opinion is a bit too willing to concede error or the possibility of error with respect to what occurred in this trial. As such, I must part ways with significant portions of the analysis.

¶ 5 In my opinion, this case is factually unique due to the repeated attempts on the victim's life. These attempts, in turn, created a rather extended period of time when the victim was experiencing trauma and stress that was truly startling and extraordinary. As such, many of the deceased's statements, which are found to be error or potential error in today's opinion, were admissible hearsay under the state of the mind exception, 12 O.S.2001, § 2803(2). Furthermore, such statements were for the most part admissible under 12 O.S.2001, § 2804(B)(2).

¶ 6 In addition, much of the "other crimes" evidence went directly to the issue of motive, intent, preparation, and planning, all of which were highly relevant and intricately connected to the State's theory and burden of proof. I also find the statements regarding insurance transfers admissible.

¶ 7 That is not to say that this was an error-free trial. Few trials, if any are. I am thus bothered by the denial of a defense witness, despite credibility issues, and two instructions that should have been given.

¶ 8 Nevertheless, the evidence in this case is overwhelming and I find the errors in this case are overwhelmed by the strong evidence of guilt. I am simply not convinced that any reversible error took place in this case.

A. JOHNSON, Judge, concurring in result in part and dissenting in part.

¶ 1 The first stage of this capital murder trial is rife with error. That error, at its most egregious, includes a pattern of introducing evidence that has no purpose other than to hammer home that Brenda Andrew is a bad wife, a bad mother, and a bad woman. The jury was allowed to consider such evidence, with no limiting instruction, in violation of the fundamental rule that a defendant must be convicted, if at all, of the crime charged and not of being a bad woman.

¶ 2 I cannot agree with the majority's analysis of the Oklahoma Evidence Code's provisions which embody this rule.[1] That analysis is contrary to the purpose of the rule and to the jurisprudence of this Court.[2]

---

1. 12 O.S.2001, § 2404.

2. *Welch v. State*, 2000 OK CR 8, ¶ 8, 2 P.3d 356, 365:

> Evidence of other crimes or bad acts is not admissible as proof of bad character to show a person acted in conformity therewith but "may ... be admissible for other purposes, such as proof of motive, opportunity, intent, prepara-

¶ 3 I concur nonetheless in the result reached by the majority opinion. The evidence of Andrew's guilt of the murder is indeed overwhelming and the fundamental principles of justice do not require a second trial on that question.

¶ 4 I cannot, however, stretch that rationale far enough to find this jury was unaffected by that evidence in deciding whether this defendant should live or die.

¶ 5 The evidence in question here included testimony about

(1) Andrew's prior adulterous affair with J.T.H., and

(2) her prior adulterous affair with another man;

(3) neighborhood boys had once told their mother that Andrew had "come on to them" when they were working at her house;

(4) on the occasion of a restaurant dinner her dress was too short, she showed too much cleavage, and someone there called her a "hoochie;"

(5) she had said she liked having workmen at her house and used them to babysit;

(6) she dyed her hair red after learning a male acquaintance was partial to redheads; and

(7) during an argument with a plumber, she threatened to kill him.

¶ 6 This is only a partial list of the testimony Andrew complains of on appeal, but it will suffice to demonstrate the tenor of the prosecutor's evidence.

¶ 7 Andrew argues that the sole purpose of this and similar evidence was to "humiliate" and "dehumanize" her. Whatever the purpose, I believe one effect was to trivialize the value of her life in the minds of the jurors. As the prosecutor argued in closing, Andrew was "different."

*Improper Statements*

¶ 8 Citing to *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976), Andrew argues that the result of the prosecution's misconduct was a sentencing procedure that did not meet the heightened standard of reliability required by the Eighth and Fourteenth Amendments.

¶ 9 During closing argument at the penalty stage of trial, the prosecutor made numerous improper statements.

¶ 10 I will address only the most immoderate of the prosecutor's statements:

1. Referring to the testimony of Andrew's distraught and sobbing 13–year–old daughter, the prosecutor told the jury, "I'm sure you noticed from the witness stand, Tricity did not beg for her mother's life." [3]

2. Referring to the testimony of Andrew's niece, "Would you put your 15–

---

tion, plan, knowledge, identity or absence of mistake or accident." 12 O.S.1991, § 2404(B). The reason other crimes evidence is so limited and its admission guarded revolves around fairness to the accused who should be convicted, if at all, by evidence of the charged offense and not by evidence of separate, albeit similar, offenses. To be admissible, evidence of uncharged offenses must be probative of a disputed issue of the crime charged, there must be a visible connection between the crimes, evidence of the other crime(s) must be necessary to support the State's burden of proof, proof of the other crime(s) must be clear and convincing, the probative value of the evidence must outweigh the prejudice to the accused and the trial court must issue contemporaneous and final limiting instructions. When other crimes evidence is so prejudicial it denies a defendant his right to be tried only for the offense charged, or where its minimal relevancy suggests the possibility the evidence is being offered to show a defendant is acting in conformity with his true character, the evidence should be suppressed.

(citations omitted). *See also Lott v. State,* 2004 OK CR 27, ¶ 40, 98 P.3d 318, 334–35; *Bryan v. State,* 1997 OK CR 15, ¶ 33, 935 P.2d 338, 356.

3. Appeals designed to inflame the passions of the jury that divert the jury from its duty to decide a case on the evidence have long been condemned by this Court. *See Tobler v. State,* 1984 OK CR 90, ¶ 28, 688 P.2d 350, 356; *Ward v. State,* 1981 OK CR 102, ¶ 5, 633 P.2d 757, 758; *Bryant v. State,* 1978 OK CR 110, ¶ 24, 585 P.2d 377, 381. The prosecutor's argument was nothing but an attempt to enrage the jury and repeat the theme that Andrew deserved the death penalty, not because the State had proved the aggravating circumstances it alleged, but because she was a bad mother and woman. This argument was outside the record and without foundation because Tricity was never asked any questions about punishment for her mother. The freedom of speech and the range of argumentation permitted during closing argument extends only to the evidence presented at trial and to reasonable inferences drawn therefrom. *Ward,* 1981 OK CR 102, ¶ 3,

year–old niece on the stand to do that? I wouldn't." [4]

3. In response to defense argument that Andrew's relatives would visit her in prison, "Rob Andrew's parents would like to visit him in prison ... the only place they get to visit is his grave." [5]

4. In response to victim impact statements not asking for death: "Did they have to say it? Wasn't it conveyed? Wasn't their message conveyed to you what punishment they want," and, "They're [the victim's family] prohibited by law from asking for a specific punishment." [6]

¶ 11 The second stage of Brenda Andrew's trial was fundamentally unfair. I find it impossible to say with confidence that the death penalty here was not imposed as a consequence of improper evidence and argument. A death sentence imposed under the influence of passion, prejudice, and other arbitrary factors cannot be upheld. *See* 21 O.S.2001, § 701.13.

¶ 12 I would reverse and remand for re-sentencing.

CHAPEL, Judge, dissenting.

¶ 1 I cannot agree to affirming the conviction in this case as I find merit in Appellant's Propositions I, II, III and IV. I would reverse and remand this case for a new trial.

---

633 P.2d at 758. "Arguments beyond the scope of the evidence can only be intended to arouse the passions and prejudices of the jurors and are improper." *Id.* It is impermissible for a prosecutor to go outside the record for purposes of appealing to the jury's passions and prejudices. *Bryant,* 1978 OK CR 110, ¶ 24, 585 P.2d at 381.

4. The prosecutor crossed the line and again went outside the record by questioning the propriety of putting on a mitigation witness who asked the jury to spare Andrew's life. The prosecutor's personal opinion that she would not have put this witness on the stand to shield the young girl from testifying in a capital sentencing proceeding reinforced the idea that Andrew was a bad person and thus she deserved the death penalty. It is improper.

5. Not only has this Court repeatedly condemned this argument, we have done so in many cases prosecuted by this district attorney's office. *See Young v. State,* 2000 OK CR 17, ¶ 99, 12 P.3d 20, 45–46; *Powell v. State,* 2000 OK CR 5, ¶ 150, 995 P.2d 510, 539; *Le v.State,* 1997 OK CR 55, ¶ 53, 947 P.2d 535, 554; *Duckett v. State,* 1995 OK CR 61, ¶ 46, 919 P.2d 7, 19. Our reprimands to seasoned prosecutors, including the lead prosecutor here, have been ignored and capital case after capital case has been jeopardized. It cannot and should not be tolerated.

6. It is improper for the prosecutor to ask jurors to have sympathy for victims. *Warner v. State,* 2006 OK CR 40, ¶ 190, 144 P.3d 838, 890. As noted in Note 3, *supra,* references to matters outside the record is error. *See also White v. State,* 1995 OK CR 15, ¶ 24, 900 P.2d 982, 993.